226 N.J. Super. 416 (1988)
544 A.2d 870
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RONALD PORAMBO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted December 8, 1987.
Decided July 18, 1988.
*420 Before Judges PRESSLER, BILDER and SKILLMAN.
Alfred A. Slocum, Public Defender, attorney for appellant (Kevin G. Byrnes, Designated Counsel, of counsel and on the brief).
W. Cary Edwards, Attorney General, attorney for respondent (Nancy A. Hulett, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
Defendant was indicted for felony murder, in violation of N.J.S.A. 2C:11-3a(3); purposeful or knowing murder, in violation of N.J.S.A. 2C:11-3a(1) and (2); conspiracy to commit robbery, in violation of N.J.S.A. 2C:5-2; two counts of armed robbery, in violation of N.J.S.A. 2C:15-1; burglary, in violation of N.J.S.A. 2C:18-2; aggravated sexual assault, in violation of N.J.S.A. 2C:14-2; possession of a handgun without a permit, in violation of N.J.S.A. 2C:39-5b; and possession of a firearm for an unlawful purpose, in violation of N.J.S.A. 2C:39-4a. A jury acquitted defendant of purposeful or knowing murder, aggravated sexual assault and one count of armed robbery, but found him guilty of the remaining charges. The trial judge merged the convictions for conspiracy to commit robbery, armed robbery and burglary into the conviction for felony murder, and sentenced defendant to life imprisonment, with 30 years of parole ineligibility, for the felony murder. The trial judge also imposed concurrent sentences of 5 years, with 2 1/2 years of parole ineligibility, on the conviction for possession of a handgun without a permit, and 10 years, with 5 years of parole ineligibility, on the conviction for possession of a firearm for an unlawful purpose.
The crimes were committed in an apartment in Irvington on April 10, 1983. The occupants of the apartment were the murder victim, Sidney Davis, and his girlfriend, Betty Johnson. *421 While Davis and Johnson were lying in bed, the doorbell rang. Davis went to the door and met a white man and a black man, who identified themselves as firemen. The men then entered the apartment. The white man wore a black beard, mustache and wig, and a fireman's hat. After the two men gained entry into the apartment, the white man brandished a gun and the black man exhibited a police slapper. The intruders indicated that they intended to rob Davis, who was a drug dealer. The black man then tied Johnson's hands behind her back with a plastic strap and raped her. Afterwards, he dragged her from the bedroom into the living room and ordered the white man to kill both Davis and Johnson. Davis responded by jumping at the white man and struggling for the gun. Two shots were fired during the struggle, killing Davis. The assailants then fled from the apartment, taking a substantial amount of cash with them. A police search of the murder scene revealed a black wig and the handgun used to kill Davis.
Approximately one month later, on May 19, 1983, defendant was found shot in his automobile in Newark. A subsequent police search of the car disclosed two handguns, ammunition, a wig, two mustaches, a beard and a police slapper.
Neither Johnson nor the other witnesses who saw the assailants enter the apartment were able to identify defendant as the white man with the black beard, mustache, wig and fireman's hat. However, Johnson testified that the police slapper found in defendant's car looked the same as the weapon used by the black man in the April 10, 1983 crime. She further testified that the black beard and mustache found in the car appeared the same as the hair on the face of the white assailant. The State also presented evidence of a similar crime committed in Westfield, in which defendant was firmly identified as a participant. In addition, it introduced an inculpatory letter which defendant wrote to the judge originally assigned to preside over the trial.

*422 I
Defendant argues that evidence of his participation in the Westfield crime violated Evidence Rule 55, which provides:
Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
The Westfield crime was committed at the residence of the Powell family on May 15, 1983, approximately one month after the murder in Irvington. Two white men rang the doorbell of the victims' house and identified themselves as police detectives, exhibiting what appeared to be a police badge. One of the men, later identified as defendant, was wearing a mustache. After gaining entry into the house, the two men pulled out guns. However, defendant slipped on the floor, and Mrs. Powell ran out of the house to call the police. The intruders then fled. Mrs. Powell positively identified defendant as the perpetrator wearing the mustache. She also testified that the mustache worn by defendant was "very similar" to one of the mustaches found in defendant's car when he was shot. In addition, she identified glasses, a gun, a folder containing a badge and a hat found in defendant's car as other items used in the attempted robbery committed in her house.
The trial judge conducted a pretrial hearing pursuant to Evidence Rule 8 regarding the admissibility of evidence of the Westfield crime. The State argued that due to the similarity of the two crimes, evidence of the Westfield crime was admissible to show defendant's identity as one of the participants in the Irvington crime. The trial judge rejected this argument and concluded that the State had failed to show that the modus operandi in the two crimes was sufficiently similar to warrant admission of evidence of the Westfield crime. But the judge pointedly noted that because Ms. Johnson had not testified at the Rule 8 hearing, he had not heard her description of the *423 "size or shape of the mustache" worn by the white man involved in the Irvington crime. Consequently, the judge concluded that "the descriptions and inferences concerning the use of the mustache at the time of the Irvington offense are not yet sufficiently developed to permit a ruling at this time that Rule 55 testimony is admissible." However, the trial judge indicated that he would be prepared to reconsider this ruling if there were evidence at trial that the same mustache had been used in both the Irvington and Westfield crimes.
At trial, Johnson testified that one of the mustaches found in defendant's car after he was shot looked the same as the mustache worn by the white participant in the Irvington crime. Mrs. Powell identified this same mustache as appearing "very similar" to the one used in the Westfield crime. Based on this additional evidence, the trial judge granted the State's renewed application to present evidence of the Westfield crime. The judge found this evidence "relevant to issues relating to possession of the mustache allegedly found in the defendant's car and its relation to the defendant's possession of that mustache and, therefore, his participation in the events in Irvington. In other words, on the subject of the identity of the defendant as a participant in the Irvington transaction."
We conclude that the trial judge did not abuse his discretion in admitting evidence of defendant's participation in the Westfield robbery in order to show his identity as a participant in the Irvington felony murder. "In order for evidence of a prior crime to be admissible on the issue of identity ... the prior criminal activity with which defendant is identified must be so nearly identical in method as to earmark the crime as defendant's handiwork. The conduct in question must be unusual and distinctive so as to be like a signature." State v. Sempsey, 141 N.J. Super. 317, 323 (App.Div. 1976), certif. den. 74 N.J. 272 (1977); see also State v. Reldan, 185 N.J. Super. 494, 501-504 (App.Div. 1982), certif. den. 91 N.J. 543 (1982). In this case, the *424 perpetrators committed both the Irvington and Westfield crimes after gaining entry into private residences by posing as public safety officials (in Irvington, as firemen, and in Westfield, as policemen). Moreover, in both crimes, the perpetrator identified as defendant wore disguises which included facial hair (in Irvington, a beard and mustache, and in Westfield, a mustache). Most significantly, the jury reasonably could have found that one of the fake mustaches found in defendant's car after he was shot was part of the disguise used in both crimes. This mustache was distinctive in appearance. Calvin Teich, the owner of the store which sold the mustache to defendant, testified that this style of mustache is distributed by a single company and that his store sells only a small number of them. Teich also testified that these mustaches are sold in 50 different colors and are trimmed to fit the features of the individual customer. Under these circumstances, we are satisfied that the trial judge reasonably found that the two crimes had similar unusual and distinctive features which warranted admission of evidence of the Westfield crime to show that defendant was the disguised white participant in the Irvington crime.
We add that a number of decisions in other jurisdictions have recognized that a particular disguise or unusual mode of dress worn by a defendant may be sufficiently distinctive to warrant introduction of evidence of another crime in order to establish a perpetrator's identity. See, e.g., State v. Ballard, 351 So.2d 484 (Sup.Ct.La. 1977) (armed robber who wore red handkerchief over lower part of face); Bissell v. State, 157 Ga. App. 711, 278 S.E.2d 415 (1981) (sexual assailant who accosted victims while nude except for a mask.)
Defendant also argues that the trial judge violated Rule 55 by allowing testimony that two loaded handguns were found in defendant's car after he was shot. However, possession of a handgun is not in itself a crime, N.J.S.A. 2C:39-5b; *425 see State v. Ingram, 98 N.J. 489, 495 n. 1 (1985), and thus the evidence of defendant's possession of the handguns did not necessarily constitute other crimes evidence subject to Rule 55. In any event, Mrs. Powell testified that one of the handguns looked the same as one of the weapons used in the Westfield crime. Therefore, defendant's possession of that weapon provided corroboration for Mrs. Powell's identification of defendant as one of the participants in the Westfield crime. Cf. State v. Garfole, 76 N.J. 445, 452 n. 2 (1978), citing People v. Albertson, 23 Cal.2d 550, 557-581, 591-599, 145 P.2d 7, 22 (Sup.Ct. 1944) (it "must be shown with reasonable certainty that defendant committed the other crime"). Moreover, while the trial judge might well have excluded this evidence under Evidence Rule 4 on the grounds that its probative value was substantially outweighed by the risk of undue prejudice to defendant, defendant has failed to demonstrate that the admission of this evidence constituted a palpable abuse of the trial judge's discretion. See State v. Carter, 91 N.J. 86, 106 (1982).

II
Defendant also argues that a reversal of his conviction is required because the jury heard evidence on two other occasions during the trial which suggested his prior involvement in criminal activity. The officer who first interviewed Mrs. Powell testified that she identified defendant's picture from a group of "mugshots" and a sheriff's officer testified that he had measured and weighed defendant four months before the Irvington crime. We agree that this testimony suggested defendant's prior involvement in criminal activity. However, the trial judge gave an appropriate curative instruction when the police officer referred to "mugshots," and he gave a limiting instruction with respect to the testimony about the weighing of defendant and the measuring of his height in December of 1982. Moreover, the police officer's comment that defendant's photograph was *426 contained in a pile of "mugshots" was fleeting and not subject to prolonged examination, and the sheriff officer's account of weighing and measuring defendant only obliquely suggested that he had been incarcerated previously. Under these circumstances, we conclude that this testimony was not "clearly capable of producing an unjust result." R. 2:10-2. See State v. O'Leary, 25 N.J. 104, 114-116 (1957) (police officer's reference to defendant's photograph as having come from "our gallery" held not to require reversal and retrial); State v. Miller, 159 N.J. Super. 552, 561-562 (App.Div. 1978), certif. den. 78 N.J. 329 (1978) (mention of "mugshots" held improper but harmless in view of fleeting mention of the word and the court's cautionary instruction); see also State v. Perez, 150 N.J. Super. 166, 171 (App.Div. 1977), certif. den. 75 N.J. 542 (1977); State v. Brewer, 142 N.J. Super. 70, 74-75 (App.Div. 1975), aff'd o.b. 70 N.J. 329 (1976); State v. Hubbard, 123 N.J. Super. 345, 350-351 (App.Div. 1973), certif. den. 63 N.J. 325 (1973).

III
A significant part of the State's evidence against defendant consisted of two letters which he wrote to the judge originally assigned to preside over the trial. Defendant argues that the State did not adequately authenticate these letters as having been written by him.
One of the letters, dated December 13, 1983, was read to the jury and the second letter, dated January 25, 1984, was admitted into evidence. The portion of the December 13th letter read to the jury stated as follows:
Please excuse my handwriting, just learning to write all over again at the age of 45 is a very, very traumatic experience to say the least.
For the business at hand I will be as brief as possible. It is my intention to engage in plea bargaining with the Prosecutor's Office, plead guilty and finally testify for the Prosecutor's Office against Page, Green, et al. I think this may appear ill-advised to you, Judge, but believe me it was meant to be. I know my *427 rights and precisely what I am doing, which I will explain to your Honor at your convenience in your chambers in detail.
Defendant's January 25th letter stated in part as follows:
... what it is is George Schneider and yourself, Judge Newman, understood the facts of my past agony of what is happening to me now, self doubt and confusion together with the true facts of what really happened last April on Lyons Avenue in Irvington. There is no doubt in my mind whatsoever but that everyone concerned would agree to grant Ron Porambo immunity from prosecution and allow him to clean up the mess he started to begin with. First of all when I was shot May 19, Ridgewood Avenue, I survived only to the operating table at the College Hospital where I died with my wife at my side.
During the three-hour operation on my brain they later told me I had been in a coma for two weeks. Actually I distinctly remember speaking with my mother in Florida on the phone, her asking me about Carol, my wife, who has never left my side even though I gave her plenty of reason to over the last 20 years of our marriage.
* * * * * * * *
... I know who nearly killed me on May 19, and they are co-defendants in my cases, hard core criminals who will go for the rest of their lives committing such crimes unless they are stopped. There is the thinking of Christ. I am the only one who can offer the kind of testimony to put these animals where they will never be able to hurt another human being.
For instance, does Mr. Schneider know that we went to the wrong apartment house on Lyons Avenue to begin with? Does he also know that not only was the Betty Johnson rape unnecessary but the rape of Sidney Davis was totally uncalled for. Last, does Mr. Schneider know I am the only person who can or will recount the last moments of Mr. Davis with the dignity with which he deserves.
* * * * * * * *
... I was in the hospital ward here on the twelfth floor ...
* * * * * * * *
To Mr. Schneider I would also say I have in my own stupidity done holdups with a lot of the men in this jail and also know the Arabs who used forged certified checks from various Detroit banks and ran around the world cashing them.
I have always told Mr. Beam that if Mr. Schneider know [sic] the quality and depth of such testimony he would grant me immunity and stop standing in Christ's path, the way he thinks their men should be handled. These were some of the things I had intended to tell your Honor at a [sic] in chamber conference with my wife there to help me.
*428 We agree with the trial judge that these letters were adequately authenticated. Defendant successfully moved, based on these and other letters, to disqualify the judge originally assigned to preside over his trial. The trial judge properly viewed this motion as an implicit admission by defendant that he authored the letters. Moreover, the letters contained information about the crime as well as personal matters which only defendant or someone close to him would know, including his age, the number of years he had been married, the length of time he was in a coma after he was shot, how long it took to perform the surgery, which floor of the hospital he stayed on, and that he had to learn to write again as a result of the brain injury caused by the shooting. Thus, the contents of the letters provided circumstantial support for the conclusion that they were written by defendant. Cf. State v. Bassano, 67 N.J. Super. 526, 532-534 (App.Div. 1961). In addition, defendant acknowledged in open court during the December 23, 1983 hearing on his motion to suppress that he was the author of the December 13th letter and that he planned to send the judge another letter "explaining my whole position in this mess." It is reasonable to infer that the January 25th letter was the further letter which defendant had said that he would write. Therefore, we conclude that both the December 13th and January 25th letters were properly authenticated.
Defendant also argues that even if the January 25th letter was properly authenticated, the trial court should have redacted the part of the letter which referred to other robberies he had committed. This part of the letter reads as follows:
To Mr. Schneider, I would also say I have in my own stupidity done holdups with a lot of the men in this jail and also know the Arabs who used forged certified checks from various Detroit banks and ran around the world cashing them.
The trial judge refused to redact this sentence on the theory that it was relevant to an understanding of the context of *429 defendant's request for immunity in the next sentence of the letter. We disagree. We are satisfied that defendant's reference to his involvement in other robberies could have been redacted without impairing the jury's understanding of the letter. Therefore, the trial judge's refusal to redact this sentence violated Rule 55.
However, this error was not sufficiently prejudicial to require a reversal of defendant's conviction. There was overwhelming evidence of defendant's guilt, including Ms. Johnson's identification of several items found in defendant's car as instrumentalities of the crime, the firm identification of defendant as a participant in the Westfield robbery and the use in that robbery of a disguise similar to the one used in the Irvington crime, and defendant's January 25, 1984 letter which admitted involvement in the crime. Under these circumstances, we are unable to conclude that there is any reasonable possibility that the failure to redact the single objectionable sentence of defendant's letter of January 25, 1987 "led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971); see State v. La Porte, 62 N.J. 312, 317-319 (1973); State v. Lynch, 177 N.J. Super. 107, 116 (App.Div. 1981), certif. den. 87 N.J. 347 (1981); State v. Neff, 67 N.J. Super. 213, 218-220 (App.Div. 1961).

IV
Defendant makes the following additional arguments:
(1) The trial court erred in permitting the State to present expert testimony that blood found near the scene of the crime had the same characteristics as defendant's blood, because there was no evidence that the white perpetrator lost blood at the scene of the crime and the test results were inconclusive.
(2) The Prosecutor exceeded the bounds of fair comment in his opening statement by attempting to instill a fear for their own safety in the members of the jury.
(3) The court erred by allowing the police composite artist to give opinion testimony to the effect that the beard, mustache and wig admitted into evidence *430 compared favorably to the description of those items given by witnesses to the crime.
(4) The trial court erred in denying defendant's motion to suppress the evidence found in his apartment because the affidavit submitted in support of the application for a search warrant failed to establish probable cause.
(5) The prosecutor's comment during summation which implied that the State could not compel defendant to testify infringed upon defendant's privilege against self-incrimination.
These arguments are clearly without merit and do not require extended discussion. R. 2:11-3(e)(2). However, we make the following brief comments. The police's observations of a trail of blood on the stairway leading from the victim's apartment to an outside door of the building provided an adequate foundation for an inference that one of the perpetrators had lost blood. Although the blood analysis testing only showed a statistical probability that defendant was one of the participants in the crime, it had sufficient probative value to justify its admission into evidence. See State v. Beard, 16 N.J. 50, 58-59 (1954); State v. Kelly, 207 N.J. Super. 114, 121-124 (App.Div. 1986). The parts of the prosecutor's opening statement objected to by defendant were improper, but "we cannot say that the challenged remarks, in the entire context of the trial, constituted plain error." State v. Hipplewith, 33 N.J. 300, 314 (1960). It was within the discretion of the trial judge to allow the police composite artist to compare the beard and mustache drawn on his composite sketch with the beard and mustache found in defendant's car as an aid to the jury in viewing his composite sketch and assessing its evidential value. We affirm the denial of defendant's motion to suppress substantially for the reasons expressed in the motion judge's oral opinion of December 23, 1983. Finally, we are satisfied that the prosecutor's statement in summation, made in response to defense counsel's summation, that the State had no obligation to call defendant as a witness, did not constitute a comment upon defendant's failure to take the witness stand.
Accordingly, we affirm the judgment of conviction.