697 A.2d 157

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JUDEL NOEL, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 3, 1997—Decided July 22, 1997.

Humphreys, J.A.D., filed dissenting opinion.

Before Judges PRESSLER, HUMPHREYS and WECKER.

*Paul Casteleiro* argued the cause for appellant.

*Hillary L. Brunell* argued the cause for respondent (*Clifford J. Minor,* Essex County Prosecutor, attorney; *Ms. Brunell,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

This appeal raises novel questions respecting scientific expert testimony that matches bullets by their composition and, more particularly, the conditions precedent to the admissibility of that evidence and the instructions that must be given the jury to aid in its evaluation thereof.

Following a trial by jury, defendant Judel Noel was found guilty of purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1); possession of a handgun without a permit, *N.J.S.A.* 2C:39–5b; and possession of a handgun with intent to use it unlawfully against another, *N.J.S.A.* 2C:39–4a. After the jury's verdict was re-

turned, defendant pleaded guilty to a severed fourth count of the indictment charging possession of another handgun and to the severed fifth count of the indictment charging the unlawful possession of hollow nose bullets.  Defendant was sentenced to life imprisonment subject to a thirty-year parole ineligibility term on the murder conviction, a consecutive five-year term on the conviction of one count of possession of a handgun without a permit, and a concurrent three-year term on the conviction of the second count of possession of a handgun without a permit.  The hollow-nose bullet charge was dismissed and the charge of possession of a handgun with the purpose of using it unlawfully was merged into the murder conviction.  Appropriate VCCB and SNSF penalties were also imposed.

In challenging the judgment of conviction, defendant makes the following arguments:

I. THE TRIAL COURT'S REFUSAL TO CONDUCT AN INDIVIDUALIZED VOIR DIRE OF JURORS PARTICIPATING IN PREMATURE DISCUSSIONS OF THE CASE DEPRIVED THE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, PARAGRAPH 9 OF THE NEW JERSEY CONSTITUTION.

II. THE ADMISSION OF THE TESTIMONY OF CHARLES A. PETERS DENIED THE DEFENDANT HIS RIGHT TO A FAIR TRIAL.

III. THE TRIAL COURT'S INSTRUCTIONS ON REASONABLE DOUBT DIMINISHED THE STATE'S BURDEN OF PROOF IN VIOLATION OF THE DEFENDANT'S RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1 PARAGRAPHS 1, 9 AND 10 OF THE NEW JERSEY CONSTITUTION.  (Not raised below)

IV. THE TRIAL COURT'S DENIAL OF THE DEFENDANT'S REQUEST TO CHARGE AGGRAVATED MANSLAUGHTER AS A LESSER INCLUDED OFFENSE VIOLATED THE DEFENDANT'S RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, PARAGRAPHS 1, 9 AND 10 OF THE NEW JERSEY CONSTITUTION.

We have carefully reviewed this record in the light of the applicable law and the arguments of counsel.  We agree with

defendant that he was prejudiced by the combination of the testimony of the State's expert witness, Charles A. Peters, an F.B.I. physical scientist, and the references made to that testimony by the prosecutor in his summation, and, in the circumstances, the court's failure to give the jury adequate instructions to assist it in dealing with that testimony. Accordingly, we reverse and remand for a new trial.

The victim of this senseless, brutal and tragic killing was a young man who was shot repeatedly on his front porch as he was returning to his home on Sanford Avenue in Newark in the early evening. There was no suggestion of any motive for the murder. No robbery was involved and there was no evidence at all suggesting any reason for this attack on the victim. According to the police testimony, on information received, neither the source nor content of which was disclosed, the police believed there might be a suspect at a house at 43 Silver Street, close to the intersection of Sanford Avenue and Silver Street. They went to that house in the early hours of the next morning and surrounded it with guns drawn. As they took up their positions, a bag of cocaine was thrown out of an upstairs window. The officers gained admission to the house and were given consent to search. The search took them eventually to the two-room attic, on whose landing they found another bag of cocaine containing some thirty vials. Four young people were sleeping in the attic rooms, among whom were Lamar Brown, who lived in the house, and his fifteen-year old girlfriend, Malika Williams, who frequently slept there. The four young people were taken to police headquarters for interrogation. Brown and Williams, in separate interviews, both said that they had witnessed the shooting and that defendant, with whom both were acquainted, was the gunman. Neither Williams nor Brown was ever charged with drug offenses.

Based on the information received from Brown and Williams, the police tracked down defendant and found him several hours later. He was asleep in the pre-parole halfway house in which he

then resided.[1]  Defendant was awakened and placed under arrest. A bag containing eighteen bullets was found in his locker.  Nine of the bullets were nine-millimeter bullets stamped with the manufacturer's name, Speers.  The police had also recovered spent bullets and bullet casings at the crime scene.  The shell casings were also stamped with the same manufacturer's name.  Defendant also told the police that he had a handgun in his bed.  The police seized that weapon, which was not, however, the murder weapon.

Before we address the expert-testimony problems, we note that without that testimony, the State's proofs consisted entirely of the two eyewitness identifications and defendant's possession of nine-millimeter Speers bullets.  There was no evidence linking defendant in any way with the victim prior to the shooting.  With respect to the eyewitness identifications, we point out first that Brown had recanted, asserting at trial that he had identified defendant as the gunman at the police station both because he had been beaten by the police and had been threatened with drug charges.  He testified that he had not even been in Newark on the day of the shooting but had been visiting a friend in another city. His prior inconsistent statement identifying defendant was admitted pursuant to *N.J.R.E.* 803(a)(1) following a hearing as mandated by *State v. Gross*, 121 *N.J.* 18, 577 *A.*2d 814 (1990).

Malika Williams, Brown's girlfriend, testified that she had spent most of the day "hanging out" at a store at the corner of Sanford Avenue and Silver Street with a group of other young people, including her boyfriend Brown, whom she claimed to be a drug dealer operating at the corner.  She had seen defendant in the area during the latter part of the afternoon, and, in fact, had gone into the house at 43 Silver Street to make two telephone calls for him at his request, reporting to him that there had been no answer.  Not long after the second telephone call and after she

---

[1] The jury, of course, was not made aware of the nature of that communal residence.

had returned to the corner, she heard the sound of shooting. Although all the other people at the corner ran away, she ran into the middle of the street to see what was happening. She saw the gunman shooting the victim and then running away past her. She testified that although the gunman was masked, the mask slipped down as he ran past her and she was able to identify him as the defendant. The police conceded that none of the other young people who had been standing at the corner had been interviewed regarding the shooting although Williams had given them the names of a number of them. One of them testified for the defense, asserting that she too had been at the corner, heard the shooting, and ran away. She also testified that she had seen Williams and another young woman leave the corner prior to the shooting and asserted that Williams was not present when the shooting took place. Finally, this defense witness further testified that Williams had admitted to her that she, Williams, had lied in making her identification of defendant and that the identification was false.

Thus, with respect to the eyewitnesses, both of whom were found in the house where a suspect was believed to be and both of whom were evidently involved with drugs, one recanted and the testimony of the other was contradicted by an apparently disinterested witness. We think it plain that without the expert bullet evidence, the State's case, so heavily dependent on the prior inconsistent statement of Lamar Brown and the testimony of Williams, was a close one, and we further note that the jury was also obviously concerned since it had asked for a read-back of Williams' testimony. Nor do we think that the evidence that defendant possessed bullets of the same calibre and manufacture as those used in the shooting tipped the scales overwhelmingly. It was surely a link, but in view of the ready availability of such bullets, hardly a conclusive one. In our view, the bullet match, without the expert testimony, had much the same effect as a suspect's possession of a shoe of the same manufacture and wide distribution as one that had left an incriminating footprint. It is

evidence to be considered, but it does not carry great probative weight. In sum, the State's case was adequate but not strong.

We consider the expert testimony, to whose admission defendant objected, in this context. The State produced Charles A. Peters, a physical scientist employed for some twenty years by the F.B.I. in its material analysis unit. Peters is highly experienced in lead bullet analysis, which, as he explained to the jury, is now performed by a complex process called coupled plasma atomic emission spectroscopy (ICP analysis), a process whose theory and application he also explained to the jury in excruciating technical detail complete with charts. The import of his testimony was that lead bullets are made from an initial source of molten lead. The source is also referred to as a batch or a pouring. It was his opinion that there is variation in each batch of the presence and percentage of trace elements, including antimony, bismuth, silver, tin, copper, and arsenic, and it is highly improbable that any two batches could have the identical composition. Since his spectroscopic analysis of the nine-millimeter bullets found in defendant's possession had the identical composition to those that killed the victim, the expert opined that the bullets had all come from the same batch. Peters also testified that in the bullet-manufacture process, the molten lead constituting the source is poured into seventy-pound blocks called billets and that the bullets are made out of the billets. It was his opinion that about 43,000 nine-millimeter bullets could be made from a single billet. Although he opined that a single batch would produce "many" billets, he was unable to quantify the number of identical billets any more specifically. It was, however, clear that at least hundreds of thousands of identical nine-millimeter bullets could be produced from the same batch. We further note that Peters expressly disavowed expertise in the manufacturing or marketing process, a disavowal no doubt accounting for his inability to quantify the number of billets produced by a batch. Nor was any testimony offered as to marketing, that is, whether, as seems likely, bullets from the same billets would be shipped together by the manufacturer and hence that there would be a concentration of such

bullets in a specific geographical region. Mr. Peters did, however, opine that bullets manufactured from the same billet are ordinarily immediately boxed and hence shipped together.

Obviously, the prosecutor's purpose in offering the testimony of Mr. Peters was to persuade the jury that the identical composition of the two sets of bullets significantly enhanced the strength of the link between defendant and the crime, that is, the link that had already been established by the identity of calibre and manufacture. That is clear from his summation, by which he attempted to impart scientific certainty to an implied conclusiveness of that link, bolstering that argument with a patently improper voucher for the credibility of his witness. This is what he said:

> Finally Mr. Charles Peters of the FBI. I realized that was some sophisticated testimony and I know I personally had trouble following it. But I hope the conclusions are what came clear.
>
> It is a very precise, scientific process that has been used for, I believe, he said about, about 30 years to test these bullet leads and his testimony is critical to this case because it completely blows away the murder theory advanced by the defense that Malika and Lamar somehow engineered the murder.
>
> Now do you think Mr. Peters was a liar? He's not a cop. He's not even an FBI agent. Charles Peters is a scientist and he looked like a scientist; didn't he? You could almost see him in a white lab coat. You could see him in math class in a high school in the back. He had all the answers.
>
> He's a straight shooter. Did not testify beyond what the results of his examination were. Didn't try to make it out to be more than what it was but it is something very critical in this case.
>
> Basically what he told us was that an examination of bullets, whenever a manufacturer is going to run a line of bullets, they order a source of lead from a lead smelter.
>
> I asked him if that was like a "batch." He said it was. The scientists like using the word "source." I think it is easier to conceive of as a batch of lead and he said that there are millions, literally millions of these batches of lead out in circulation. And from those millions of batches of lead out in circulation, there are billions of bullets produced each year.
>
> The key, I submit to you, is not what Mr. Roberts said it is, not about the number of billets produced—the number of bullets produced, *the key is the number of sources of lead; the number of batches. Millions of batches; each one unique like a snow flake; like a fingerprint.*
>
> [Emphasis added.]

At that point defense counsel objected to the characterization. The judge's response was "[m]etaphor; overruled," and the prose-

cutor continued, summarizing the technical testimony and emphasizing the asserted significance of the batch identity. Finally, we note that in his charge to the jury regarding expert testimony, the judge gave only the brief and standard form of instruction, merely telling the jury that an expert is a person with special knowledge, skill, experience or training, permitted for that reason to express an opinion but that the jury is not bound by that opinion. There was no reference to the content or significance of Mr. Peters' testimony.

To begin with, we have no doubt that ICP analysis of lead bullets is a process adequately accepted by the scientific community and producing sufficiently reliable results to warrant the admission of expert testimony regarding the test and the test results. Although the issue has not been addressed in a reported opinion in this State, we reach that conclusion based on Peters' testimony and the rationale employed in those jurisdictions so holding in respect of both ICP bullet analysis and predecessor, less sophisticated tests. *See, e.g., Bryan v. Oklahoma,* 935 *P.*2d 338 (Okla. Crim.App.1997); *U.S. v. Davis,* 103 *F.*3d 660 (8th Cir.1996), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 2424, 138 *L.Ed.*2d 187 (1997); *State v. Freeman,* 531 *N.W.*2d 190 (Minn.1995); *State v. Strain,* 885 *P.*2d 810 (Utah.Ct.App.1994); *State v. Grube,* 126 *Idaho* 377, 883 *P.*2d 1069 (1994), *cert. denied,* 514 *U.S.* 1098, 115 *S.Ct.* 1828, 131 *L. Ed.*2d 749 (1995); *People v. Johnson,* 114 *Ill.*2d 170, 102 *Ill.Dec.* 342, 499 *N.E.*2d 1355 (1986), *cert. denied,* 480 *U.S.* 951, 107 *S.Ct.* 1618, 94 *L. Ed.*2d 802, *reh'g denied,* 481 *U.S.* 1060, 107 *S.Ct.* 2205, 95 *L. Ed.*2d 860 (1987); *State v. Ware,* 338 *N.W.*2d 707 (Iowa 1983); *Jones v. State,* 425 *N.E.*2d 128 (Ind.1981) (Hunter, J. dissenting). *See also* Erwin S. Barbre, Annotation, *Admissibility of Evidence of Neutron Activation Analysis,* 50 *A.L.R.*3d 117 (1973) and supplemental service.

Consequently, we are satisfied that the State was entitled to have the jury apprised that its expert had concluded, for the reasons he explained, that the two sets of bullets had the identical composition and came from the same batch of lead. We are

nevertheless persuaded that prejudicial foundational omissions from that expert testimony, coupled by the way in which it was commented upon, deprived defendant of a fair trial. The concerns we have appear not to have been either raised or addressed by the out-of-state opinions holding the evidence admissible except in Justice Hunter's dissent in *Jones v. State, supra*, 425 *N.E.*2d at 134.

Our essential difficulty with the evidence is this. As we have noted, defendant's possession of the same calibre bullets of the same manufacture as those that killed the victim constitutes a link between defendant and the crime, but of limited, or at least potentially limited, probative weight. Establishment of the fact that the two sets of bullets came from the same source of lead clearly enhances the probative weight that a jury would be inclined to accord to mere similarity of calibre and manufacture. The problem is in what we regard to have been an unwarranted enhancement of probative weight inherent in the expert's testimony and the prosecutor's comment thereon.

We think it plain that the enhancement value to be placed on the same-batch conclusion must be basically a statistical probability exercise, that is, an assessment by the trier of fact of how much more likely it is that both sets of bullets were defendant's because they not only matched in calibre and manufacture but also in composition. That assessment must necessarily depend on how many nine-millimeter bullets could have been produced from a single batch, what the likelihood is that those same bullets wound up for sale in the same geographical area, and what percentage of nine-millimeter bullets marketed in the Newark area came from Speers. Obviously, the strength of the link created by identical composition is a factor of how many bullets of identical composition were simultaneously available for sale in the Newark area, and, just as obviously, the statistical probability of defendant having possessed both sets of bullets declines as the number of identical bullets increases.

Peters was unable to testify to the total number of such bullets because he could not say how many billets come from a single batch. Nor did he testify as to how many bullets are shipped for sale in a single consignment or in what quantity the manufacturer boxes bullets. It is probable that the jury's assessment of the strength of the link would be affected by whether defendant had a handful of similar bullets out of 1,000, or out of 10,000, or out of 100,000, or out of a million.

The critical significance of affording the jury a statistical basis upon which to evaluate inconclusive scientific evidence has been recognized by at least one scholar. Thus, as explained by Professor Margaret A. Berger in *Procedural Paradigms For Applying the Daubert Test*, 78 *Minn. L.Rev.* 1345, 1356–1358 (1994):

> Prior to *Daubert* [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 *U.S.* 579, 113 *S.Ct.* 2786, 125 *L. Ed.*2d 469 (1993) ], courts admitted scientific evidence without noticing that, in some instances, the probative value of the evidence depends on background statistical information. If, for example, the samples of tape to which a defendant had access at his place of work match samples of tape used to manufacture a bomb sent through the mails from an unknown location, the probative value of that evidence is virtually non-existent if thousands of identical rolls of tape were distributed throughout the world. The crucial scientific inquiry in these cases is not only whether the technique is capable of producing matches, but also the probability that other matches exist.
>
> It is true of course that when a test can reliably match two samples, such as samples of a defendant's blood, hair, drugs, or bullets, with samples taken at the crime scene, the resulting evidence passes the basic Rule 401 relevancy test. A match does have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." We allow eyewitnesses to testify that the person fleeing the scene wore a yellow jacket and permit proof that a defendant owned a yellow jacket without establishing the background rate of yellow jackets in the community. Jurors understand, however, that others than the accused own yellow jackets. When experts testify about samples matching in every respect, the jurors may be oblivious to the probability concerns if no background rate is offered, or may be unduly prejudiced or confused if the probability of a match is confused with the probability of guilt, or if a background rate is offered that does not have an adequate scientific foundation.

[Footnotes omitted.]

In sum, the consequence of Peters' expertise in bullet lead composition but his lack of expertise in bullet manufacturing and marketing deprived the jury of a fair basis on which to evaluate

the significance of the bullet-lead identity testimony. Thus, as Justice Hunter observed in *Jones v. State, supra,* 425 *N.E.*2d at 135:

> The lack of certainty in Agent Riley's ultimate conclusion is further emphasized by his testimony that as many as 100,000 bullets are produced from the same batch of lead, that 200 boxes of bullets of similar composition would in turn result, and that all retailers in a particular geographic area might consequently market bullets of similar composition. Furthermore, Agent Riley stated that "there are other leads that are going to be manufactured some place along the way that can be very close to this composition, if not the same." In stating that the bullets "could have come" from the same source, he offered little more than an educated guess ....

*See also,* directly addressing the type of bullet-match scientific evidence here involved, Andre A. Moenssens, et al., *Scientific Evidence In Criminal Cases,* 541 (3d Ed.1986) noting:

> that while courts have admitted neutron activation analysis to match bullets and to link the accused to a crime involving the use of a firearm, "the number of bullets manufactured with similar elemental characteristics by the same manufacturer may be so numerous as to make the likelihood of the accused's link to the evidence bullet statistically tenuous."

> [Berger, *supra,* at 1357 n. 71.]

The New Jersey Supreme Court, in *State v. Spann,* 130 *N.J.* 484, 617 *A.*2d 247 (1993), has addressed the problem of expert opinion, whose significance, as here, is necessarily affected by variables that are not explicated. The issue in *Spann* involved bloodtesting to establish paternity. As the Court there noted, traditionally available modes of bloodtesting were sufficient to exclude the conclusion of paternity but not to prove paternity. But although only evidence of exclusion was admissible in a civil action to establish paternity, non-exclusion evidence was admissible in a criminal trial despite its light probative weight, because, as the Court explained, even though such evidence was "insignificantly probative," it nevertheless was admissible as a "link in the chain of evidence in criminal trials just as the alleged assailant's blond hair is used against a blond defendant." *Id.* at 490, 617 *A.*2d 247. In *Spann,* the expert, using HLA (human leukocyte antigen) testing, concluded that based on Bayes' Theorem, a mathematical probability formula, the probability of defendant's paternity was 96.55%. Employment of that formula was predicated

on assumptions and variables the jury clearly did not understand or have before it and as to which it was not instructed, resulting in inevitable confusion on its part as to how to evaluate and assess the expert testimony and, therefore, resulting in prejudice to the defendant.

We appreciate that *Spann* dealt with probability testimony expressed in percentages and that the expert testimony here did not quantify the probability of the ultimate conclusion, namely, that defendant had possessed both sets of bullets. But we think the principle is the same, and that principle, as we understand it, is that when the probative significance of expert testimony is dependent on statistical probabilities and the testimony is likely to be misleading out of the context of the relevant variables determining the statistical probabilities, the jury must be given sufficient guidance, either by additional foundation testimony or by the court's instruction, to be able to understand and assess the true import of the testimony. This necessity is obviously further compelled by the well-recognized phenomenon, as stated by Justice Hunter in his *Jones* dissent, that "extensive and impressive credentials such as those revealed here, together with the testimony of a sophisticated technological nature far beyond the average layman's understanding, may impress a jury and influence inordinately the weight which is attached to the expert's testimony." 425 *N.E.*2d at 137. And when that expert is an F.B.I. agent, inappropriately vouched for by the prosecutor, that eventuality is exaggerated.

In our view, the expert testimony here had a clear capacity to confuse the jury and mislead it into ascribing significantly more probative weight to the identical-composition expert opinion than it warranted. This problem could have been avoided by requiring the State to submit foundation evidence of the nature we have suggested and by instructions from the court explaining to the jury the inherent probative limitations of the expert opinion. Nor would we exclude the necessity of a hearing under *N.J.R.E.* 403 in the event no curative foundation evidence were proffered for the

purpose of permitting a judicial determination of whether the probative value of the evidence is outweighed by its prejudicial effect. As the United States Supreme Court pointed out in *Daubert, supra,* 509 *U.S.* at 595, 113 *S.Ct.* at 2798, 125 *L. Ed.*2d at 484, with respect to expert evidence having an inordinate capacity for prejudice:

> Finally, Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Judge Weinstein has explained: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D., at 632.

*See also* Berger, *supra,* at 1358.

Beyond the inherent problems with the expert testimony itself, we are also persuaded that the prosecutor's "snowflake or fingerprint" comment during closing must necessarily have further misled the jury in its task of assessing the probative value of Peters' identical-composition testimony. We recognize that to some extent the comment did not actually mischaracterize the testimony that the batches were most likely unique, although there was no real evidential basis for the "millions of batches" comment. The point, of course, is that the relationship of batches to billets to bullets was already confusing enough and insufficiently developed by the expert testimony. Thus, the clear import of the fingerprint and snowflake comparison was to suggest to the jury a scientific certainty in the inference that defendant had possessed both sets of bullets and to suggest to the jury a conclusiveness of that inference that clearly was not warranted. We conclude, therefore, that no matter how indulgently we might view the problems with the expert testimony itself, the prosecutor's summation, uncorrected by the court on defendant's objection, injected a high degree of prejudice into this trial.

We recognize that to some extent, the defense could have dealt with some of the problems we have identified by way of cross-examination and summation. But it had no opportunity to correct the prosecutor's summation. And the fact remains that the ex-

pert's testimony, taken as a whole, nevertheless had the inherent capacity, because of the omissions we have identified, to have misled this lay jury. Because we are persuaded that the State's case was close, we conclude that defendant's right to a fair trial was prejudiced by the expert testimony and the comment thereon.

We have carefully considered defendant's remaining contentions and have concluded that they are without sufficient merit to warrant disposition by written opinion. R. 2:11–3(e)(2). The judge did not mistakenly exercise his discretion in dealing with the agitated juror; the reasonable doubt charge, read in context, was entirely correct; and there was no reasonable basis in the record to charge aggravated manslaughter. This was an assassination.

We reverse and remand for a new trial.

HUMPHREYS, J.A.D., dissenting.

Antwan Hargrove died on his front porch in a hail of bullets. Two eyewitnesses identified the defendant as the killer. When arrested a few days later, the defendant had bullets in a bag in his locker at the State prison half-way-house. The bullets were of the same caliber as those used to shoot Antwan Hargrove. Tests by the State's expert showed that some bullets in the defendant's bag and some bullets at the crime scene were of identical composition, came from the same batch of lead and were manufactured by the same manufacturer, the Speer Company. The defendant did not offer any contrary expert testimony.

My colleagues reverse this conviction largely on "plain error" grounds, that is on issues not raised below. See R. 2:10–2. They consider this case to be "close." They reverse because they are "persuaded" that the testimony of the State's expert coupled with a one sentence proper comment by the prosecutor in his summation might have confused the jury as to the probative force of the test results on the bullets. They conclude that the "foundation" for the expert's testimony was insufficient. They would require the trial judge to *sua sponte* fashion a charge "explaining to the jury ... the inherent probative limitations of the expert opinion."

Majority opinion, op. at 448, 697 A.2d at 164.  I disagree with all of these conclusions and would affirm the defendant's conviction.

## I

The State's case was strong, not close.  The testimony of the female eyewitness to the shooting was clear and certain.  She was subjected to extensive cross-examination.  Her credibility is for the jury, not for an appellate court.

The other eyewitness had given the police a written statement under oath in which he said he saw the defendant shoot Antwan Hargrove.  At trial, he claimed that he had lied to the police because five or six police officers beat him.  A hearing was held outside the presence of the jury.  The eyewitness testified at the hearing and admitted that the alleged beatings had left practically no marks and that he had not sought medical attention.  A police officer testified at the hearing that the witness was not beaten in any way and that the witness's statement was entirely voluntary.

At the end of the hearing, the trial judge ruled that the statement was admissible.  The judge found that the witness's written statement identifying the defendant as the killer was "inherently believable."  The judge said that he did "not believe the witness'[s] testimony with respect to pressure placed upon him or any coercion placed upon him to make the statement.  I believe the officer in that regard."

The two eyewitnesses and the evidence of the defendant's possessing bullets of the same caliber and manufacturer as those used to shoot Antwan Hargrove add up to strong evidence of the defendant's guilt.

## II

My colleagues state they are satisfied that "the State was entitled to have the jury apprised that its expert had concluded, for the reasons he explained, that the two sets of bullets [the ones from the shooting and the ones in the defendant's bag] had the

identical composition, and came from the same batch of lead." Nonetheless, the majority finds that there were "prejudicial foundational omissions" to the introduction of this evidence. I disagree.

The expert's testimony was well founded. He was a physical scientist employed by the Federal Bureau of Investigation. He had worked for the FBI for nearly seventeen years and was their chief chemist in bullet lead analysis.

He was well qualified on the subject. He had testified as an expert on bullet lead analysis on numerous occasions and had analyzed tens of thousands of bullets. He was a co-author of two papers that deal with bullet lead analysis. He was "familiar with the bullet manufacturing process." He had toured the Speer manufacturing plant and had reviewed their manufacturing processes for bullets. This testimony provided ample support for the trial judge's decision to permit the expert to testify on these subjects. *See Dawson v. Bunker Hill Plaza Assoc.,* 289 *N.J.Super.* 309, 323, 673 *A.*2d 847 (App.Div.) (a proper foundation has been laid if the witness is in possession of such facts as will enable the witness to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture), *certif. denied,* 146 *N.J.* 569, 683 *A.*2d 1164 (1996); *see also State v. Zola,* 112 *N.J.* 384, 414, 548 *A.*2d 1022 (1988) ("The necessity for, or propriety of, the admission of expert testimony, and the competence of such testimony, are judgments within the discretion of the court."); *Foley Mach. Co. v. Amland Contractors, Inc.,* 209 *N.J.Super.* 70, 76, 506 *A.*2d 1263 (App.Div.1986) (trial judge has broad discretion to determine whether expert testimony should be admitted); *cf. Dinter v. Sears, Roebuck & Co.,* 252 *N.J.Super.* 84, 92, 599 *A.*2d 528 (App.Div.1991) (admission or exclusion of proffered evidence is within judge's discretion; reversal is required only when an unjust result has occurred).

The expert's statement on cross-examination that he was not an "expert in the manufacturing process" goes to the weight not the admissibility of his testimony. *See State v. Frost,* 242 *N.J.Super.*

601, 615, 577 *A.*2d 1282 (App.Div.), *certif. denied,* 127 *N.J.* 321, 604 *A.*2d 596 (1990). ("The credibility of the expert, and the weight to be accorded his or her testimony, is assessed by the trier of fact; any testimonial or experience weaknesses in the testimony may be exposed by cross-examination."); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 *U.S.* 579, 596, 113 *S.Ct.* 2786, 2798, 125 *L.Ed.*2d 469, 484 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Furthermore, the expert's testimony about the test results and the manufacturing process was virtually undisputed. Defense counsel in his summation did not question the accuracy of the testimony of the State's expert. Nor does defense counsel in his appellate brief appear to seriously question the accuracy of the expert's testimony. My colleagues also do not appear to question the accuracy of his testimony. Their challenge to the expert's testimony centers on the strength of its probative force, but this is an issue which the jury should determine.

The expert's testimony was balanced and fair. Basically, the expert testified that the initial source of bullets is a pot of lead sometimes called a batch. A manufacturer orders a billet of lead. A billet is a seventy pound cylinder of lead taken from a batch. Bullets are then extruded from the billet. Bullets from the same billet would have the same composition, i.e. the same amount of trace metals. It is not unusual, the expert testified, to find bullets in a box of ammunition which have several compositions. This is because, the expert testified, "what we have in between bullets being made, they're being stored and some mix occurs and that is why in a box of ammunition we'll get several compositions of bullet lead." However, "if you find several of these compositions within bullets, it suggests that they came from that box of ammunition or a box that was manufactured or packaged around that date."

The expert tested nine bullets from the defendant's bag and six spent bullets from the crime scene. The tests were for trace

metals. The bullets were all nine millimeter and all manufactured by Speer. The tests showed that all but one of the bullets could be divided into four different groups. The bullets in each of the four groups were "analytically indistinguishable" from each other, i.e., each bullet in that group had the same amount of trace metals. Each group contained bullets from the defendant's bag and a spent bullet or bullets from the crime scene.

Thus, some bullets from the crime scene and some bullets from the defendant's bag came from the same batch and billet used at Speer. That does not mean that the bullets used to shoot Antwan Hargrove necessarily came from the defendant's bag. The expert readily conceded on cross-examination that over 4,300 bullets could be manufactured from one billet; that there could be many billets with the same lead composition; and that there were many thousands of bullets, "at least 50,000", with the same composition as those he had tested.

The expert was forthright and candid in his testimony. Defense counsel and the judge agreed that the expert had not significantly hurt the defense. At a side bar conference, the judge said: "Doesn't sound to me like he's done anything you're afraid of." Defense counsel responded: "He certainly had not. He's been pretty straight."

The expert's testimony was clearly admissible under *N.J.R.E.* 702 which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.
>
> [*Ibid.; see also* Biunno, *Current N.J. Rules of Evidence*, cmt. to *N.J.R.E.* 702 ("Rule 702 follows *F.R. Evid.* 702 verbatim . . . .").]

The rule permitting expert testimony is a liberal one. *See State v. Berry*, 140 *N.J.* 280, 290–93, 658 *A.*2d 702 (1995) (expert evidence is admissible if it will assist the jury in comprehending the evidence and determining issues of fact); *see also Williams v. Hedican*, 561 *N.W.*2d 817, 822 (Iowa 1997) (Iowa's Rule 702, which is exactly the same as *N.J.R.E.* 702, is a "liberal rule on the

admission for expert testimony"); *Wilt v. Buracker,* 191 *W.Va.* 39, 443 *S.E.*2d 196, 210 (1994) (Neeley, J., concurring) ("... Rule 702 adopts a liberal stance on admitting expert testimony and favors admissibility by investing trial judges ... with broad discretion to admit expert testimony."); *State v. Glidden,* 459 *N.W.*2d 136, 140 (Minn.Ct.App.1990) ("The evidentiary rule regarding admission of expert testimony [Rule 702] is liberal."); *State v. Kersting,* 50 *Or.App.* 461, 623 *P.*2d 1095, 1100 n. 2 (1981), ("Rule 702 of the Federal Rules of Evidence [which New Jersey follows verbatim] adopts a liberal approach to the admission of expert testimony...."), *aff'd,* 292 *Or.* 350, 638 *P.*2d 1145 (1982); *cf. State v. Long,* 119 *N.J.* 439, 495, 575 *A.*2d 435 (1990) (noting that the Third Circuit has a "'liberal test' for admission of expert testimony" under *F.R. Evid.* 702).

The expert was not asked and did not give any opinion about the probability that the bullets from the crime scene came from the defendant's bag. His testimony was not, as the majority says, a "statistical probability exercise." Majority Opinion, at 445, 697 *A.*2d at 162. In essence, he testified that his tests showed that some of the bullets from the crime scene and some of the bullets found in the defendant's bag had the identical amount of trace metals. His testimony merely added another link to the chain of evidence.

Such evidence is eminently proper. *See State v. Baldwin,* 47 *N.J.* 379, 391–92, 221 *A.*2d 199 (1966) (Weintraub, C.J.) (expert testimony on soil composition and hair particles is admissible over an objection that it was "too speculative;" jury would determine "[h]ow much it was worth"); *State v. Beard,* 16 *N.J.* 50, 59, 106 *A.*2d 265 (1954) (human blood stains found on defendant's clothing were a link in the chain of evidence forged by the State and were entitled to be weighed, with the other evidence presented, by the jury in arriving at its conclusion); *State v. Porambo,* 226 *N.J.Super.* 416, 430, 544 *A.*2d 870 (App.Div.1988) (blood analysis testing which showed a statistical probability that defendant was a participant in the crime had sufficient probative value to justify admission into evidence); *State v. Kelly,* 207 *N.J.Super.* 114, 121–22, 504

A.2d 37 (App.Div.1986) (blood analysis testing is not conclusive as to source of blood specimens found in defendant's truck but were admissible as showing desired inference more probable than it would have been without the evidence); *State v. Hollander*, 201 *N.J.Super.* 453, 480, 493 *A.2d* 563 (App.Div.1985) (fiber tests which showed that fibers on victim's body and fibers from defendant's home had a common source were admissible, even though it was not certain that "an evidential fiber belongs to a particular known sample."); *see also State v. Freeman*, 531 *N.W.2d* 190, 195 (Minn. 1995) (the evidence included results of bullet tests showing close compositional association between bullets found in defendant's gun cabinet and bullets found at crime scene); *People v. Johnson*, 114 *Ill.2d* 170, 102 *Ill.Dec.* 342, 353–54, 499 *N.E.2d* 1355, 1366–67 (1986) (bullet lead analysis, while not conclusive, is admissible as clearly importing "more than a possibility of common origin;" lack of certitude in results or inconclusiveness of test results goes to weight not admissibility); *Bryan v. State*, 935 *P.2d* 338, 358–59 (Okla.Crim.App.1997) (circumstantial evidence included evidence that bullets in defendant's possession and bullet fragments in victim's head were all manufactured by the same company and appeared to be from the same source or batch).

Scientific evidence need not be conclusive to be admissible. *State v. Marcus*, 294 *N.J.Super.* 267, 287, 683 *A.2d* 221 (App.Div. 1996) ("For scientific evidence to be admissible, we only require that the scientific technique or procedure be accepted as scientifically reliable, not that it produce results which are beyond all legitimate debate."). In *State v. Krummacher*, 269 *Or.* 125, 523 *P.2d* 1009 (1974), the State introduced the results of bullet lead analysis to establish that the fatal bullet could have come from the same batch of metal as the group of bullets taken from the defendant's home. The Supreme Court of Oregon upheld the trial judge's admission of the test results notwithstanding the defendant's contentions that it had not been shown the bullets came from a particular batch and that there was insufficient evidence of the total number of batches of similar bullets manufactured by that company. *Id.*, 523 *P.2d* at 1017. The Oregon Supreme Court

said that the defendant's contentions "go to the evidence's convincing power rather than to its admissibility." *Ibid.; see also State v. Dreher,* 302 *N.J.Super.* 408, 464, 695 *A.*2d 672 (App.Div.1997) ("Expert testimony should not be excluded merely because it fails to account for some condition or fact that the opposing party considers relevant. That party may on cross-examination, supply the omitted conditions or facts and ask the expert if his or her opinion would be changed by them.").

The case of *State v. Spann,* 130 *N.J.* 484, 617 *A.*2d 247 (1993), relied on by the majority is clearly distinguishable from the present case. In *Spann,* the defendant was convicted of sexual assault. A child resulted from the assault. The State's expert testified that based on blood and tissue tests, the "probability" of the defendant's "paternity was 96.55%." The Court pointed out that the expert knew "absolutely nothing about the facts of the case except those revealed by the blood and tissue test of defendant, the victim, the child and that the defendant was the accused." *Id.* at 489, 617 *A.*2d 247. The Court noted that this type of mathematical probability opinion testimony is highly prejudicial because if, for example, it could be conclusively proven that the defendant was out of the country at the time when conception could have occurred, the "expert still would have concluded that the probability defendant was the father was 96.55%." *Id.* at 495, 617 *A.*2d 247.

The problem arose, the Court said: "when a mathematical computation is added to the [evidence] mix, one that purports precisely to calculate the probability of the ultimate issue." *Id.* at 504, 617 *A.*2d 247. Further evidence is required, the Court said, before such mathematical probability opinion testimony is admissible. *Id.* at 498–99, 617 *A.*2d 247.

The Court in *Spann* carefully distinguished mathematical probability opinion testimony from the admission into evidence of the blood test results. The Court pointed out that the results of the test are admissible not to prove paternity conclusively but as a link in the chain of evidence. The Court said:

*Even though insignificantly probative, it [the test result] nevertheless was admissible as "a link in the chain of evidence" in criminal trials,* just as the alleged assailant's blond hair is used against a blond defendant. *See State v. Beard,* 16 *N.J.* 50, 58–59, 106 *A.*2d 265 (1954) (holding type O—the victim's blood type and also the most common type—blood stains on defendant's clothing admissible as "link in the chain of evidence"); *see also State v. Alexander,* 7 *N.J.* 585, 593–94, 83 *A.*2d 441 (1951) (allowing evidence of defendant's blood type at murder trial for purpose of showing it was of the same type as blood found on the murder weapon), *cert. denied,* 343 *U.S.* 908, 72 *S.Ct.* 638, 96 *L. Ed.* 1326 (1952).

[*Spann, supra,* 130 *N.J.* at 490, 617 *A.*2d 247 (emphasis added).]

In the present case, the expert did not present any mathematical formula nor express any conclusion based on such a formula. Furthermore, he gave no opinion as to the probability that the bullets from the crime scene came from the defendant's bag. His opinion was that some of the bullets in the defendant's bag and some of the bullets from the crime scene came from the same batch or source of metal from which the seventy pound billet was made and from which bullets were extruded. Such evidence is simply a link in the chain of evidence and thus clearly admissible in criminal trials. *See ibid.; see also Andre A. Moenssens et al.; Scientific Evidence in Criminal Cases* § 4.21 at 246 (3d ed. 1986) ("The use of various instrumental techniques to analyze the trace elements in bullet lead has enabled an expert to identify a bullet as having come from a particular batch of bullets. If bullets having trace elements similar to a crime bullet are found in a defendant's possession, this may be *significant circumstantial evidence of guilt.*" (emphasis added)).

Moreover, the defendant had the opportunity to conduct and did conduct a probing and able cross-examination of the expert. The defendant also had the opportunity to produce his own expert witness if he seriously challenged the testimony of the State's expert.

Further, if the expert's testimony was misleading or prejudicial, the defendant could have asked the judge for a specific charge. The defendant did not ask for such a charge, perhaps agreeing with Justice Hunter's statement in *Elza v. Liberty Loan Corp.:* "We entrust juries to evaluate the degree of reliability which

should be attached to testimony in such highly technical matters as the nuances of [bullet] neutron activation analysis." 426 *N.E.*2d 1302, 1311 (Ind.1981) (Hunter, J., dissenting).

In any event, there is no sound basis for my colleagues' conclusion that the trial judge was required in this case to *sua sponte* fashion a charge for the jury. The charge the judge gave contained the usual instructions regarding the testimony of an expert. The defendant had no objection to the charge. The failure to object bars any later challenge to either the charge or any omission therefrom unless the charge or the omission is clearly capable of prejudicing a substantial right. *See R.* 1:7–2; *R.* 1:7–5; *R.* 2:10–2; *see also State v. Macon*, 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971) (Weintraub, C.J.) (a court may infer from a party's failure to object at trial that "in the context of the trial, the error was actually of no moment").

My colleagues' reliance on Justice Hunter's dissent in *Jones v. State*, 425 *N.E.*2d 128, 135 (Ind.1981) (Hunter, J., dissenting), is misplaced. In *Jones*, the State's expert compared the bullets taken from the defendant's pocket with a portion of the bullet removed from the victim. The expert testified that based on his testing, the bullet taken from the victim's body "could have come" from the box of ammunition which contained bullets seized from the defendant. *Id.* at 131. Justice Hunter viewed this evidence as lacking "reasonable scientific certainty to imbue it with probative value." *Id.* at 135 (Hunter, J., dissenting). In contrast, the expert in the present case did not testify that in his opinion the bullets from the crime scene *could have*, or did, come from the defendant's bag. Instead, the expert presented to the jury the results of his scientific analysis of the bullets.

Authorities in other jurisdictions almost uniformly permit bullet lead analysis to be introduced into evidence. In *Johnson, supra*, the FBI agent testified that the absence of a particular element in the samples prevented him from ultimately designating a match between the bullets found in the defendant's home and the bullets recovered from the victim. 102 *Ill.Dec.* at 353, 499 *N.E.*2d at 1366.

The expert testified, however, that there was a "significant correlation" and that the samples he tested "would commonly be expected to be found among bullets in the same box of cartridges with compositions just like these and .... could best be found from the same type and manufacture packaged on the same day." *Ibid.*

The Court found in *Johnson* that the testimony of the FBI agent "while not conclusive, clearly supports more than a possibility of common origin." *Ibid.* The Court therefore found the evidence admissible stating that "any lack of certitude in a qualified expert's testimony, or inconclusiveness in the results of an otherwise reliable neutron-activation analysis goes to the weight and not to the admissibility of such evidence." *Id.* at 354, 499 *N.E.2d* at 1367. The Court said: "[c]learly the test results were relevant in establishing, as more probable, the material fact that the bullets from the ... murder were from the same box as the cartridges found in defendant's home." *Ibid.*

In *Bryan, supra,* the court found as proper circumstantial evidence that bullet fragments in the victim's head were manufactured by the same company and "appeared to be from the same source or batch" as those found in the defendant's possession. 935 *P.2d* at 359. The court said that the FBI agent's testimony "provides more than speculation that the bullets came from the same box, and did not invade the province of the jury." *Id.* at 360. The court explained that the evidence assisted the jury "in understanding the evidence suggesting that the bullets in this case came, not only from the same manufacturer, but from the same metallurgical source and were probably found in the same box." *Ibid.; see also Freeman, supra,* 531 *N.W.2d* at 195 (permitting this evidence to be considered by the jury); *Jones, supra,* 425 *N.E.2d* at 131 (same); *Krummacher, supra,* 523 *P.2d* at 1017 (same).

### III

The prosecutor did not make a misstatement in his summation. The prosecutor said that there are "[m]illions of batches; each one

unique like a snow flake; like a fingerprint." Defense counsel objected, saying that was not the testimony as to "batches or billets." The judge responded, "[m]etaphor; overruled." The prosecutor continued saying:

> [the expert] said they were unique and all could be distinguished. I'm giving you an example, like snowflakes could be distinguished. Use your own recollection, of course, but that's the key to the examination. They could take any two batches of lead and they could distinguish them, based on the amount of the various elements in them.

The prosecutor's statement was not incorrect. The statement was fair comment based on the evidence presented by the expert.

In sum, my colleagues have spun out of gossamer threads a chimera of an unfair trial. *See Snyder v. Massachusetts,* 291 *U.S.* 97, 122, 54 *S.Ct.* 330, 338, 78 *L. Ed.* 674, 687 (1934) (Cardozo, J.) ("gossamer possibilities of prejudice" should not "set the guilty free."). The reality is quite different. No error was committed in this trial, plain or otherwise. The rulings of the experienced trial judge were sound and well within his discretion. No "novel questions" are presented in this case. See majority opinion, at 437, 697 *A.*2d at 158. The testimony of the State's expert was unexceptionable and patently admissible. His testimony was not crucial or highly prejudicial evidence of a type which would sway a jury. Indeed, the jury here focused not on the testimony of the expert but rather on the testimony of the eyewitnesses as shown by the jury asking for a read-back of the eyewitness testimony but not for the expert's testimony. The prosecutor's statement in summation was a fair comment on the evidence. The State's case was strong.

The defendant received a fair trial. The jury having heard the evidence and having been properly charged on the law decided that the defendant murdered Antwan Hargrove. The jury's verdict should stand.