697 A.2d 171

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ROY CARSWELL, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted March 26, 1997—Decided July 25, 1997.

464

Before Judges LONG, SKILLMAN and CUFF.

*Susan L. Reisner*, Public Defender, attorney for appellant (*Lucille M. Rosano*, Designated Counsel, of counsel and on the brief).

*Clifford J. Minor*, Essex County Prosecutor, attorney for respondent (*Gary A. Thomas*, Assistant Prosecutor, of counsel; *A.J. Batista*, Law Clerk, on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

Defendant, Roy Carswell, was charged under Essex County Indictment No. 2431–5–90 with the following offenses: (1) fourth

degree aggravated assault, contrary to the provisions of *N.J.S.A.* 2C:12–1(b)(4) (Count One); (2) third degree unlawful possession of a firearm, contrary to the provisions of *N.J.S.A.* 2C:39–5(b) (Count Two); (3) second degree possession of a weapon for an unlawful purpose, contrary to the provisions of *N.J.S.A.* 2C:39–4(a) (Count Three).

Tried by a jury, he was convicted on all three counts. After merging the conviction on Count One into the conviction on Count Three,[1] the trial judge sentenced defendant to a seven year custodial term with three years of parole ineligibility on Count Three and to a concurrent four year custodial term on Count Two. Appropriate Violent Crimes Compensation Board penalties were also imposed.

Defendant appeals, contending that the following errors warrant reversal:

*POINT I:*

THE ADMISSION OF EVIDENCE THAT DEFENDANT WAS KNOWN TO CARRY A GUN AND HAD CARRIED A GUN PRIOR TO THE INCIDENT FOR WHICH HE WAS BEING TRIED WAS A CLEAR VIOLATION OF *EVID. R.* 55 BECAUSE THE JURY WAS THEREBY LED TO BELIEVE THAT DEFENDANT WAS A PERSON WHO WAS PREDISPOSED TO COMMIT CRIME. (Partially Raised Below).

*POINT II:*

THE TRIAL COURT DIRECTED A VERDICT OF GUILTY WHEN IT IN-STRUCTED THE JURY THAT IF DEFENDANT IS FOUND GUILTY, THE OFFENSES WILL ULTIMATELY BE MERGED. (Raised As Plain Error).

A. The Trial Court's Instruction On Merger Improperly Suggested To The Jury That Defendant Would Not Be Punished For All Three Offenses Even If He Were Found Guilty Of Them; Thereby Allowing The Jury To Improperly Speculate About Punishment.

B. The Trial Court's Instruction Improperly Directed A Verdict Against Defendant On Count Three Because It Suggested That The Jury Need Not Reconsider Elements It Already Found Existed With Regard To Counts One and Two.

---

[1] The parties state that Count One merged with Count Two. However, the Judgment of Conviction indicates that Count One merged with Count Three.

C. The Trial Court Should Have Accepted The Jury's Partial Verdict On Counts One and Two, Instead Of Coercing Them to Reach A Unanimous Verdict On All Three Counts.

D. The Trial Court Should Have Declared A Mistrial With Regard To Count Three After The Jury Indicated It Could Not Reach A Verdict On That Count.

*POINT III:*

DEFENDANT'S SENTENCE IS EXCESSIVE AND SHOULD BE REDUCED ON APPEAL.

We have carefully reviewed this record in light of these contentions and have concluded that a reversal is in order.

The facts adduced at trial are as follows: In 1992, defendant lived with his girlfriend, Delisa Bullock, her son, Amire, and her sister, LaToya Bullock, in Delisa's Newark apartment. Delisa was Latoya's legal guardian. On May 22, 1992, an argument between defendant and Delisa took place in the apartment, which was witnessed by LaToya. According to LaToya, during the argument Delisa asked defendant to leave but defendant refused to do so. An argument between defendant and LaToya ensued after which she also asked defendant to leave. The argument then moved into the hallway of the apartment building, at which time defendant allegedly pulled a gun from the waistband of his pants, implied that he was going to hit LaToya with it, and also pointed it at her. Delisa and LaToya left the building at this time and, pursuant to Delisa's instruction, LaToya called the police from a pay phone in front of the building and waited there until their arrival.

When the police arrived, LaToya told them she was threatened by a man with an uzi. The two women accompanied the police to their apartment where they found defendant sitting on a table in front of a bed. The police began to search the apartment, and thereafter, Latoya testified that the police recovered the gun from the roof of the building after defendant told them where it was located. LaToya subsequently identified the .44 caliber gun as the one which had been pointed at her by defendant and defendant was later arrested.

Delisa did not paint the same picture as LaToya. Particularly, Delisa testified that she and defendant were arguing about her son

(who defendant treated as a step child), when LaToya entered the apartment. LaToya "jumped in between the argument" by arguing with defendant and subsequently, was asked by both defendant and her sister to stay out of it. Allegedly LaToya then became upset and left the room, indicating that she was going to get a "hammer or something." Thereafter, Delisa states that she and defendant attempted to settle the argument. Approximately twenty minutes later, LaToya returned with the police and defendant was arrested. Delisa indicated that she did not instruct LaToya to call the police, as LaToya testified. Delisa also stated that, prior to seeing the gun shown by the police after it was found on the roof, she had never seen the gun before, nor were any guns kept in the apartment. The State presented LaToya's brother, Stewart Bullock, as a rebuttal witness who testified that he had seen defendant with the gun on prior occasions. The jury apparently accepted LaToya's version of the events and convicted defendant on all counts. This appeal followed.

*I*

Defendant contends that the State's witnesses, LaToya and Stewart Bullock, should not have been permitted to testify that defendant was known to carry a gun and had been seen carrying the gun in question on other occasions. More particularly, defendant asserts that such testimony allowed the jury to infer that defendant had not only committed the assault and weapons possession offenses for which he was being tried, but also that he was a generally violent and assaultive person. Thus, defendant contends, this testimony was a violation of former *Evid. R.* 55 [2] which addressed the admission of evidence of other crimes or civil wrongs.

During LaToya's direct examination by the State, the following exchange took place:

---

[2] At the time of the trial, the New Jersey Supreme Court had not yet adopted *N.J.R.E.* 404(b).

Q. I show you what is marked S-1 (the gun) for identification, could you just take a look at that and tell me if you recognize that?

A. Yes.

Q. And where do you recognize that from?

A. From Roy.

Q. And when was the first time you saw that?

A. I saw it.

At this point, defense counsel objected, arguing at sidebar that other crimes evidence was not relevant to this matter and that there had not been a hearing regarding such evidence. The trial judge overruled the objection, indicating that the testimony was for identification purposes.

The direct examination of LaToya continued:

Q. When was the first time you saw that weapon?

A. Approximately, a week before the incident between me and him.

Q. And who had the weapon the first time you saw it?

A. Roy Carswell.

Q. And then when was the next time you saw it?

A. When the incident occurred.

Q. Okay. Now, when the officers brought you this weapon, did you identify this?

A. Yes.

Q. Are you positive that that's the gun he pulled on?

A. I'm absolutely positive this is the gun.

The trial judge called a sidebar at this point, and asked the prosecutor whether it was the State's intention to limit the unlawful purpose under Count Three "to just pointing that weapon or us[ing] that weapon against LaToya," or was the State pursuing a "general [unlawful] purpose." The prosecutor responded that he was not pursuing a general purpose. Thereafter, the trial judge gave the jury the following cautionary instruction:

Ladies and gentlemen of the jury, you've heard testimony from Miss Bullock indicating that she identified the handgun in question here and also testified that she had seen it previously. I permitted that testimony to take place but for the very limited purpose. I charge you that you are to consider it for a very limited purpose. You are not to take into account or to infer that the defendant had that handgun on his person on another dates other than the specific dates of this particular incident. The specific date is May 22nd, 1989. But I charge you that you are to draw no inferences nor are you to speculate as to why the defendant had

the handgun on his person, if you so find that he did. And on days prior to that date. I limit that testimony simply for the purposes of identification only. Identification only of the handgun.

There was no objection to this instruction.

Later, the State's rebuttal witness, Stewart Bullock, who was not a witness to the May 22, 1989 incident between LaToya and defendant, was permitted to give testimony as follows:

Q. Mr. Bullock, I ask you to look at what's been marked S–1 (the gun) in evidence. Do you recognize that?

A. Yes, I do.

Q. How do you recognize that?

A. I seen it about two, three times before.

Q. Where were those times?

A. On South Orange Avenue.

Q. Who did you see with that weapon?

A. Roy, Roy.

Q. The time you saw him with this weapon, was that before this incident?

A. Yes.

The trial judge immediately gave a cautionary instruction regarding this testimony. He explained:

Once again, I permitted the last identification or the last question and answer merely for the purposes of identification. You are not to infer that anything criminal or any criminal activity, any wrongful activity occurred prior to the actual incident which has been testified to here, if you find that such an incident occurred, by the way, on May 22, 1989.

There was no objection to this instruction.

■ *Evid. R.* 55, which was in effect at the time of trial, provides in pertinent part:

[E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but ... such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.

As an initial matter, testimony concerning possession of a gun at another time does not necessarily constitute other-crimes evidence subject to *Evid. R.* 55. *State v. Porambo,* 226 *N.J.Super.* 416, 424–25, 544 *A.*2d 870 (App.Div.1988). This is because *Evid. R.* 55 excluded evidence only of "a crime or civil wrong." Evidence that

a defendant possessed a handgun is not itself a crime and probably does not fall within the realm of a civil wrong.[3] *Ibid.;* Biunno, *New Jersey Rules of Evidence,* comment 3 on *Evid. R.* 55 (1992).

However, because this jury knew defendant did not have a permit to carry a handgun, as this was a stipulated fact, there existed a danger that the jurors would assume that defendant's prior possession of a handgun was a criminal offense. Defendant argues that "[t]he jury undoubtedly inferred from this extraneous evidence that defendant had a propensity to commit crime and accordingly, must have committed the crimes with which he was charged." In fact, defendant's argument continues, "[t]his evidence was in no way relevant to any material fact in issue with regard to the offenses charged in the indictment" and thus, should have been excluded pursuant to *Evid. R.* 55. The State counters that even if *Evid. R.* 55 governs, the testimony is nevertheless admissible because it was offered for the sole purpose of identification, which is specifically addressed in the rule as a permissible basis for admission. The State argues that this testimony was developed simply to refute defendant's attempts to deny his ownership of the weapon.

The danger that *Evid. R.* 55 sought to prevent is that a defendant will be prejudiced by evidence of other acts which lead a jury to convict because defendant is a bad person disposed to commit crime. *State v. Moore,* 113 *N.J.* 239, 275, 550 *A.*2d 117 (1988). Generally, in order to be admissible, other-crimes/civil-wrongs evidence must be relevant to a material issue which is genuinely disputed; it must be established clearly and convincingly; and its probative value must not be outweighed by prejudice to the defendant. *State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992). Where identity, common scheme or plan are at issue, a fourth test is applicable: that the crime or wrong is similar in kind and close in time to the offense with which defendant is currently

---

[3] Under the current rule, *N.J.R.E.* 404(b), the word "acts" has been included (i.e., "other crimes, wrongs, or acts").

charged. *Ibid.; see* Biunno, *Current N.J. Rules of Evidence,*
comment 8 on *N.J.R.E.* 804(b) (1996–1997).

We think the evidence in this case meets the *Cofield* standards.
The testimony of LaToya and Stuart Bullock was introduced to tie
the gun which was found at the scene of the crime to defendant.
Such evidence is plainly relevant to an issue in dispute, i.e.,
whether the gun introduced into evidence was the same gun which
LaToya alleges, and defendant denies through Delisa, that he used
on May 22, 1989. *See State v. Loftin,* 287 *N.J.Super.* 76, 92, 670
*A.*2d 557 (App.Div.), *certif. denied,* 144 *N.J.* 175, 675 *A.*2d 1123
(1996); *State v. Wood,* 130 *N.J.Super.* 401, 410, 327 *A.*2d 440
(App.Div.1973), *aff'd,* 66 *N.J.* 8, 327 *A.*2d 425 (1974).

Moreover, the testimony of LaToya and Stewart Bullock
provided clear and convincing evidence to suggest that defendant
owned the gun in question, having been seen with it by both
witnesses before this crime. While it is true that the trial judge
did not hold a preliminary hearing with respect to the introduction
of the testimony, this error was harmless because the testimony
was restricted to identifying the gun and the jury was adequately
instructed with regard to it. Finally, the probative value of the
testimony was not substantially outweighed by the danger of
unfair prejudice to the defendant. In order to prove its case, the
State needed to establish that the gun was in the possession of
defendant on the date in question. In an effort to do this, the
State attempted to show that defendant in fact owned the gun.
The defense had the opportunity to cross-examine LaToya and
Stewart Bullock, as well as provide its own witness, Delisa Bull-
ock, who denied seeing defendant with the gun.

To be sure, due to the inherently prejudicial nature of such
evidence, trial judges should carefully formulate an instruction to
"explain precisely the permitted and prohibited purposes of the
evidence, with sufficient reference to the factual context of the
case to enable the jury to comprehend and appreciate the fine
distinction to which it is required to adhere." *State v. Stevens,*
115 *N.J.* 289, 304, 558 *A.*2d 833 (1989). While the judge's instruc-

tion on this point was not a model of thoroughness, it passed muster in that it advised the jury of the limited purpose of the evidence. In sum, the testimony was properly admitted for the limited purpose of establishing defendant's ownership of the handgun.

## II

We turn next to defendant's claims that the trial judge erred in discussing the concept of sentencing merger during the jury instruction. Because defendant failed to object to the jury instruction on this issue during the trial, the error, if any, must be viewed in terms of its capability of producing an unjust result. *R.* 1:7–2; *R.* 2:10–2; *State v. Macon,* 57 *N.J.* 325, 335–36, 273 *A.*2d 1 (1971).

The following is what occurred: The trial judge instructed the jury on the elements of the three counts of the indictment on July 16, 1992. At 10:00 a.m., the jury retired to begin its deliberations. At 11:30 a.m., the jury sent a note to the judge which said: "We need help with count three. Please clarify for us again." The trial judge proceeded to re-read his instructions on Count Three. The jury resumed deliberations at 11:35 a.m. and was excused for lunch from 12:30 p.m. until 1:30 p.m. At 3:17 p.m., the jury sent the judge a second note which read: "Can the defendant be charged with possession of a weapon for unlawful purpose, at the point and time that he actually took possession of the gun from his belt to commit an unlawful act upon the plaintiff which was established by testimony." After discussing the question with counsel, the judge had the jury restate its question. The jury responded at 4:00 p.m. with the following question: "[D]oes count three pertain and again at the point and time the defendant pulled the gun from his pants for an unlawful purpose upon plaintiff." The trial judge responded:

> Ladies and gentlemen of the jury, the answer to that inquiry is a question of fact that you must decide. I cannot, nor should I attempt to decide that for you. Keep in mind I am not privy to what goes on in the jury deliberations room, and I don't

know where you are in connection with which this defendant has been charged. And that's proper.

So therefore, it is almost impossible, it is impossible, not almost, for me to answer that question without invading your province as the judge of facts. And I can't for that reason.

The judge then read the statute and elements of Count Three again at the jury's request. The trial judge gave the jury the option of resuming deliberations or continuing in the morning. The jury chose to continue in the morning and was thus excused at 4:35 p.m.

The jury continued its deliberations the next day, and at 10:20 a.m. sent the judge a note which read: "[C]an we enter verdicts on two counts while we are unable to reach a verdict on the third count." After discussion with counsel, the trial judge wrote on the jury's note: "The verdict on each count must be unanimous."

At 11:30 a.m., the jury sent a note stating: "[M]uch to our dismay we are unable to reach a unanimous decision on all three counts." The trial judge determined that he would again charge the jury on its duty to continue to deliberate and reach a unanimous verdict. Also, based upon a review of the jury's notes from the preceding day, the judge advised both counsel that he decided to charge the jury on merger which he stated is part of his "standard charge," but which he had skipped due to an error. No objection was made by either counsel, both having apparently agreed that the instruction was proper.

The jury was brought into the courtroom at 11:35 a.m. The trial judge gave the jury the following instruction:

Ladies and gentlemen of the deliberating jury, Madam Foreperson, I received your most recent note, received it 11:30, and it reads as following: Much to our dismay, we are unable to reach a unanimous decision on all three counts. The jury. Ladies and gentlemen, the verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto. Your verdicts must be unanimous. It's your duty as jurors to consult with one another and deliberate with a view towards reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or affect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans, you are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

Ladies and gentlemen, of the jury, over the course of last evening, I was reviewing in my mind the questions that you had asked me and which we discussed yesterday afternoon. I refer specifically and I had these marked as to C–2 in evidence, which I received 3:17 yesterday afternoon. That question was, can the defendant be charged with possession of a weapon for an unlawful purpose at the point in time that he actually took possession of the gun from his belt to commit an unlawful act upon the plaintiff which was established by testimony.

My recollection is I responded and asked you to please restate that question or rephrase it. And you did. You sent back a question which I marked C–4 in evidence that read; does count three pertain and again at the point and time the defendant pulled the gun, pulled the gun from his pants for an unlawful purpose upon plaintiff.

You recollect, ladies and gentlemen, that in response to that latter question I indicated that was a question of fact and then I indicated I asked the foreperson whether or not you wish for me to read my entire charge on count three again or just the elements of count three again and I did so.

In thinking about that last evening, ladies and gentlemen, I reached a determination that the question that was asked, being asked here was not purely a question of fact, it was a question of law. And therefore, I am going to charge you. It's not totally a question of law though. I was that absolutely wrong. And you must understand that neither the attorney nor I are permitted to speculate as to what is troubling you. Or I answered—could be totally wrong, it could mislead you. *But I believe that perhaps one of the—what I'm about to charge you might be of help to you. It concerns you may have what should the punishment be for someone convicted of a crime. Now that is not your responsibility as a juror. But in order for the judge who imposes the sentence in a case where someone is found guilty of a crime to impose an appropriate sentence the legislature has taken great pains to define crimes with some care.*

*If the conduct is such and such and the mental state is so and so, and the harm resulting is such and such, then you may have one crime with a certain punishment appropriate. If you change those around a little bit you have another crime. If you change them around still another way you have still another crime. So that even though crimes the legislature defines maybe very related, may even overlap in many aspects, as you change those different factors the legislature says they are different crimes and the thought is to try to define a crime so precisely that the punishment that is appropriate will better be suited to the particular variation of crime being defined. And that means that sometimes the situation such as the one we're dealing with here now where one might think perhaps there are only one or two crimes we're talking about, actually we're talking about a number of crimes being charged in this case. And we don't know how you will*

*decide what happened here. So we don't know whether you will decide that any crimes were committed by the defendant. We don't know if you will find there are any criminal activity here at all. We don't know which crimes you will find were committed. So we have to ask you to consider several crimes.*

*This does not mean that if you find the defendant is guilty of more than one crime it does not necessarily mean that he'll be punished for those two crimes or three crimes. Sometimes they'll blend, they'll merge. That will be the responsibility of the judge who sentences, that is not your responsibility.* But each of the crimes you are asked to consider somewhat different from the other, because different elements is there and that the state must establish with respect to conduct, with respect to what the defendant had in mind and often with respect to how serious the effect of that conduct was in hurting someone.

[Emphasis added.]

Jury deliberations recommenced at 1:50 p.m., following a lunch break, and at about 2:30 p.m. the jury sent another note to the trial judge. After calling the jury back into the courtroom, the judge explained:

Ladies and gentlemen of the jury, we did receive your last communication shortly before 2:30 this afternoon. The first—it's in three parts. The first part: 10 jurors are stuck on an issue concerning the timeframe in which the law applies and 2 feel they understand this question specifically—oh, feel they understand, I'm sorry. This question specifically pertains to the third element of Count 3.

In order that I might—counsel might understand, I want to be concerned that we are all talking about the same thing. The elements that I charged you as to Count 3 are as follows: One, that S–1 is a firearm; two, defendant possessed S–1; three, defendant's purpose or conscious objective was to use the firearm against the person of another; and four, defendant intended to use the firearm in a manner that was proscribed or prohibited by law.

Those are the four elements that I charged you with, before I charge you to them again. Now, Madam Foreperson, does this first question specifically pertain to the third element as I just charged you?

Foreperson: Yes, yes.

Court: All right. The—I'm going to answer that question, ladies and gentlemen, but I want to answer it in the context of your second question, also. We are also at issue over the interrelationship of the three counts. Are these three complete and separate charges? And sub-question: Is it important to treat these as separate charges? Bear with me for a moment, please.

Ladies and gentlemen, as I charged you just a short while ago, I indicated that for sentencing purposes, and I indicated to you that you are not concerned with sentencing, that's my responsibility, not yours. The legislature have specifically defined the various elements of the offenses. I indicated to you that sometimes, those elements overlap, and indeed, they do sometimes overlap but that determination has to be made by you. That's a fact determination. I'm talking about how the legislature structured various defenses.

Sometimes the legislature started out with the same elements and then added some or deleted some, so that when I charged you before that sometimes these criminal offenses overlap, they do, indeed. Because sometimes, they have some of the same elements. But you folks must make the factual determination. I'm dealing strictly with the legalisms. I'm dealing strictly with the law and how the legislature has expressed itself, and that's what I meant when I said to you before that—when I was describing the kind of thought process that the legislature went through to define these various offenses.

I said if the conduct was such-and-such and the mental state is so-and-so, and the harm resulted in such-and-such, then you have one crime with the certain punishment appropriate. If you change those around a little bit, you have another crime. If you change those around still a little bit more, you have still another crime. So, even though crimes that the legislature defined may be very related, may even overlap in certain respects, as you change those different factors which are the elements, the legislature says they are different crimes. And the thought is to try and define a crime so precisely that the punishment that is appropriate will be better suited to the particular variation of the crime defined.

In certain instances, and as I charged you when I was defining the element of certain of these offenses with which the defendant is charged in this indictment, some of those elements are identical; but some are entirely different. So, in response to your question: Are these complete and separate charges? Indeed, they are charging three complete and separate offenses. However, some of those offenses contain the exact same elements. Yes, indeed, you must treat these separate offenses separately. You must make a factual determination as to what occurred. The State has established beyond a reasonable doubt each and every element of the separate offenses keeping in mind, however, that with certain of those offenses the elements are identical, and with certain others, they're not. There are more elements involved. *That's why I felt that when I charged you just a short while ago with respect to merger and with respect to the various elements that might have been of aid to you, that's why I charged you; not to create more problems for you.*

[Emphasis added.]

The jury resumed its deliberations following the instructions and was dismissed at 3:30 p.m. for the weekend.

On Monday, July 20, 1992, the jury again resumed deliberations. At 10:05 a.m., the jury asked for the judge to "[p]lease, repeat the charges and the elements for all three counts." The trial court recharged the jury on all three counts of the indictment.

The jury resumed deliberations at 10:20 a.m. and, fifteen minutes later, reached a verdict of guilty on all three counts.

■ It is well-established that "jurors decide the facts in accordance with the law as instructed by the court, and the court

determines the punishment to be imposed upon the finding of guilt." *State v. Reed,* 211 *N.J.Super.* 177, 184, 511 *A.*2d 680 (App.Div.1986) (citing *Pope v. United States,* 298 *F.*2d 507, 508 (5th Cir.1962), *cert. denied,* 381 *U.S.* 941, 85 *S.Ct.* 1776, 14 *L.Ed.*2d 704 (1965)), *certif. denied,* 110 *N.J.* 508, 541 *A.*2d 1368 (1988). It is also well established that because a jury has no sentencing function, "it should be admonished to 'reach its verdict without regard to what sentence might be imposed.' " *Shannon v. United States,* 512 *U.S.* 573, 579 114 *S.Ct.* 2419, 2424, 129 *L.Ed.*2d 459, 466 (1994) (quoting *Rogers v. United States,* 422 *U.S.* 35, 40, 95 *S.Ct.* 2091, 2095, 45 *L.Ed.*2d 1, 7 (1975)). "[T]rial by jury in criminal cases in New Jersey and other states traditionally requires a separation of the functions of a jury and the court in non-capital cases." *Reed, supra,* 211 *N.J.Super.* at 184, 511 *A.*2d 680. Thus, a general rule has emerged that jurors are not to be informed as to the possible sentence of a defendant. *Ibid.*

This traditional rule is based upon the rationale that informing the jury would: "(1) draw attention away from their chief function—to judge facts; (2) open the door to compromise verdicts, and (3) confuse the issue or issues to be decided." *Id.* at 185, 511 *A.*2d 680 (citing *Pope, supra,* 298 *F.*2d at 508). Another suggested reason is that the instruction is simply of no aid to the jury in determining one's guilt or innocence. *Ibid.*

Defendant advances a number of separate arguments with respect to the so-called merger instruction: (1) that it was tantamount to directing a verdict on all three counts of the indictment; (2) that it improperly led the jury to speculate about his sentence; (3) that it had the effect of directing a verdict on Count Three because it suggested that the jury need not reconsider elements it had found to exist on Counts One and Two; and, (4) that it had a coercive effect on the jury whose partial verdict should have been accepted and a mistrial declared on Count Three.

█ We disagree with defendant that the judge's merger instruction had the effect of directing a verdict on all counts of the

indictment. Taken as a whole, the instruction did not direct a verdict on any count.

■ We also disagree with defendant's argument that the charge suggested that the jury need not reconsider elements it had already found to exist with regard to Counts One and Two. This is not a fair reading of what was said. The fact that the judge noted that there was an overlapping of elements was not a suggestion that the State was released from the requirement of proving the elements of each offense beyond a reasonable doubt. *See State v. Ragland,* 105 *N.J.* 189, 194–95, 519 *A.*2d 1361 (1986).

■ We also reject defendant's claimed entitlement to a partial verdict and a mistrial on Count Three at the point at which the jury indicated it was unable to reach a verdict. Partial verdicts are a discouraged practice. *State v. Shomo,* 129 *N.J.* 248, 257, 609 *A.*2d 394 (1992). Moreover, a trial judge "may send a jury back for further deliberations when [he or she] is not satisfied that all possibilities of reaching a verdict have been exhausted, but [he or she] may not coerce or unduly influence the jury in reaching a verdict." *State v. Childs,* 204 *N.J.Super.* 639, 647–48, 499 *A.*2d 1041 (App.Div.1985) (quoting *State v. Cottone,* 52 *N.J.Super.* 316, 326, 145 *A.*2d 509 (App.Div.1958), *certif. denied,* 28 *N.J.* 527, 147 *A.*2d 305 (1959)). In other words, the trial judge was within his rights to continue deliberations after the jury had expressed doubt as to its capacity to agree on Count Three. Defendant had no absolute right to a partial verdict or a mistrial at that point.

■ This is not to suggest that the merger instruction was proper. It was not. It violated the fundamental principle established in *State v. Reed, supra,* that jurors are not to be informed as to the possible sentence of a defendant. This interdiction does not only apply to information as to specific sentence exposure, but also to general statements such as the one in this case:

> This does not mean that if you find the defendant guilty of more than one crime it does not necessarily mean that he'll be punished for those two crimes or three crimes. Sometimes they'll blend, they'll merge.

This statement suffers from a number of infirmities. It invites the jury to speculate as to which of the charges before it, if any, will blend or merge. It suggests, at least obliquely, that doubts over guilt or innocence on a specific charge may ultimately be of no concern because of merger. It paves the way for jurors to compromise their verdict. Most importantly, it essentially takes the focus off the real issue in the case—i.e., whether the State has proved each and every element of each and every offense charged beyond a reasonable doubt.

An additional problem exists here because of its timing in the deliberative process. As we explained earlier, this jury advised the judge by note three times on the first day of deliberations that it was struggling over Count Three—possession of a weapon for an unlawful purpose. This, a second degree crime, was the most serious offense charged. The following morning, after further deliberations, the jury asked to enter verdicts on two counts because they were unable to reach a verdict on the third count. The judge responded that "the verdict on each count must be unanimous." An hour later, the jurors sent another note indicating that they were deadlocked and could not reach a unanimous decision on all three counts. Presumably the third count was the issue, as it had apparently been the day before and earlier that day. It was at that point that the merger charge was given. The jury deliberated further and asked another question as to Count Three. In responding, the judge again referred to his earlier merger instruction. The jury was then excused for the weekend; asked for and received a recharge on the elements of all three offenses on Monday morning, and shortly thereafter returned guilty verdicts on all three counts.

It is impossible to know what effect the merger language had on this jury's deliberations. This much is clear however: until that concept was advanced, the jurors expressed three times that they were having problems with Count Three and twice that they were deadlocked on that Count. After the merger language, they were able to reach a verdict on Count Three. Whether they believed

that merger would somehow take care of Count Three because defendant would not be punished for all three offenses is impossible to know. Indeed, the merger instruction may have led them to speculate that the possessory weapons counts would merge into the aggravated assault count when actually the opposite was true and it was Count Three which set the parameters of defendant's sentence. This is the danger of injecting the alien concept of sentencing into an adjudication of guilt or innocence.

As important to us is that it is not at all clear that the difficulties expressed by the jurors with Count Three had anything *at all* to do with a concern over what punishment would be imposed on defendant if he was found guilty. In fact, a review of the jury's questions reveals that it asked the same question which the judge had asked the prosecutor at sidebar during the trial: whether unlawful purpose under Count Three was limited to pointing the weapon at LaToya or whether some other unlawful purpose had to be proved. That question was never answered. Instead, the judge launched into what appears to be an entirely unsolicited explication of overlapping elements and merger which could have only served to confuse the jury. *See Reed, supra,* 211 *N.J.Super.* at 185, 511 *A.*2d 680. A judge's obligation is to answer the question asked and, in so doing, to clear the confusion which generated the inquiry. *State v. Conway,* 193 *N.J.Super.* 133, 157, 472 *A.*2d 588 (App.Div.), *certif. denied,* 97 *N.J.* 650, 483 *A.*2d 174 (1984). That is not what happened here.

It is certainly possible that the jury in this case may not have been misled at all by the judge's merger charge or that it was only misled in connection with Count Three. We will never know. While it seems likely from the jury's questioning that it had reached a unanimous verdict on Counts One and Two before the offending merger language was used, we cannot say with certainty that this is so or that the merger language did not affect the outcome on all counts. Thus we reverse the judgment entered on all three convictions and remand the case for retrial or such other

disposition as the parties may agree on. This ruling renders the sentencing issue raised by defendant moot.

Reversed and remanded.