IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 16, 2016 at Knoxville

**STATE OF TENNESSEE v. NICOLE PAMBLANCO**

**Appeal from the Circuit Court for Montgomery County**
**No. 41301121    John H. Gasaway III, Judge**

—————————

**No. M2015-01870-CCA-R3-CD – Filed November 29, 2016**

—————————

Following a jury trial, the Defendant, Nicole Pamblanco, was convicted of aggravated child neglect and criminally negligent homicide. She now appeals as of right, challenging (1) the sufficiency of the evidence by claiming that the State failed to establish the requisite mental state of knowing for her aggravated child neglect conviction and (2) the trial court's erroneous instruction to the jury during voir dire that, if she were found guilty on both counts, those counts would merge. Following our review, we conclude that the evidence was sufficient to support her aggravated child neglect conviction and that the jury instruction error was harmless. Therefore, the trial court's judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Christopher G. Clark and Zachary L. Talbot (on appeal), Clarksville, Tennessee; and Michael J. Flanagan (at trial), Nashville, Tennessee, for the appellant, Nicole Pamblanco.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; John W. Carney, District Attorney General; and Kimberly S. Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

The Montgomery County Grand Jury charged the Defendant with aggravated child neglect and reckless homicide after the Defendant's seven-month-old daughter ("the victim") drowned in a bathtub on August 22, 2013. See Tenn. Code Ann. §§ 39-13-215, -15-402. The Defendant and her husband ("the Defendant's husband" or "the victim's father") lived in Clarksville, along with the victim and their three other children. The Defendant was a stay-at-home mom, and her husband worked at Jiffy Lube. A jury trial was held in April 2015, where the following facts were adduced.

Jennifer Hubbard and the Defendant had been "acquaintances" for several years. Due to a recent disagreement, Ms. Hubbard asked the Defendant if she could "come over" for a visit on August 22, 2013. The Defendant responded affirmatively and requested Ms. Hubbard to bring with her a "Strawberrita," "a tall can of alcohol[,]" when she came. According to Ms. Hubbard, when she arrived at the Defendant's home, she "[g]ot out of [her] car with the Strawberrita, walked up to the door, and . . . rang the doorbell."

The Defendant answered and invited Ms. Hubbard to come inside. They sat down in the living room to talk. The Defendant opened her can of Strawberrita and took a drink; Ms. Hubbard only recalled the Defendant's taking one drink of the beverage. Ms. Hubbard said that, while they conversed, she could hear children playing in another room, and although "they sounded rambunctious and playful[,]" the Defendant never got up to check on them. Ms. Hubbard described the Defendant's demeanor while they spoke: "She seemed fine and in good spirits. . . . She seemed pretty relaxed[.]" The Defendant's husband also testified that the Defendant appeared "[n]ormal" that day and did not seem to be sad or upset about anything.

Ms. Hubbard testified that the Defendant's husband came inside from mowing the grass "a good ten minutes" into their conversation. The Defendant's husband explained that, when he entered, the two women "were just having a conversation like two normal girls would, just chatting away." He saw the can of Strawberrita the Defendant was drinking, and he opined that Ms. Hubbard had to have brought the alcohol with her because there was not any in his house prior to that time. He said that he spoke to the women only briefly because he needed to use the restroom, speaking to them about three to four minutes at most, in his estimation. Then, because he could hear the children "going haywire" in the other room, he went to check on them—two two-year-old boys, a five-year-old boy, and five-year-old girl were present in the children's bedroom. The boys were jumping on the bed, and he told them to calm down. Hearing "[t]he sound of running bath water[,]" he went to the bathroom near the children's bedroom first but saw nothing. When he went to the bathroom in the master bedroom, he saw the victim "face down floating on the tub, water overflowing." There was an abundant amount of water on the bathroom floor, which had reached the bedroom carpet, according to the

-2-

Defendant's husband. The Defendant's husband said that he reacted quickly, grabbing the victim from the bathtub and turning off the water, which was about "halfway running[.]" He said the victim "was blue, lifeless, limp, like [he] pulled a noodle out of a pot." He took the victim to the living room and began performing cardiopulmonary resuscitation ("CPR").

According to Ms. Hubbard, she heard the Defendant's husband's screaming, and when he emerged from the back of the house carrying the victim, he was upset and yelling, "[W]hat happened? What did you do? What's wrong with [her]?" Ms. Hubbard described the victim's appearance: "She was blue, there was water coming out of her mouth and nose, very limp." Ms. Hubbard took over administering CPR on the victim. Although the victim did not have a pulse, she performed CPR for "[a] good five minutes[.]" The Defendant called 911.

While Ms. Hubbard was performing CPR, the victim's father went to a neighbor's house for help. He knocked on Kasi Sinclair's door around 6:50 p.m., and when she answered, he asked, "[D]o you know CPR, my baby is dying?" Ms. Sinclair described the victim's father's demeanor at that time: "He was panicking, he was breathing heavily and he was kneeling with his hands on his knees." Because Ms. Sinclair did know how to administer CPR to infants, she went next door to help.

When Ms. Sinclair entered the home, she saw Ms. Hubbard and the victim's mother "hovering of the victim" who was on the living room floor. Ms. Sinclair then observed Ms. Hubbard pick up the victim, put the victim on her left shoulder, and start "to pat" the victim as if "burping a baby." According to Ms. Sinclair, as Ms. Hubbard did this, "a lot of water" started coming out of the victim's mouth and nose onto Ms. Hubbard's shirt, so Ms. Sinclair took the victim from Ms. Hubbard immediately and began performing CPR. Ms. Sinclair testified that she put the victim on her knee and "started doing downward thrusts [and] water started coming out of [the victim's] mouth[.]" The victim did not have a pulse at that time, according to Ms. Sinclair. Ms. Sinclair continued CPR on the victim by "swiping to make sure that there was nothing in [the victim's] mouth and then [she] put two small breaths and [the victim's] chest rose and then [she] began with the two fingers." Although these tactics appeared to be working in Ms. Sinclair's opinion, every time Ms. Sinclair would push on the victim's chest water came out of the victim's mouth. She continued with CPR until emergency medical services ("EMS") arrived on the scene and took over.

Ms. Sinclair was asked if she made any observations of the Defendant while she was giving the victim CPR. Ms. Sinclair said that the Defendant "wasn't acting like a [m]om" and that "[s]he smelled of alcohol"; however, Ms. Sinclair agreed that the Defendant did not display "any signs that she was under the influence." Additionally, Ms. Sinclair later visited the family at the hospital, and according to Ms. Sinclair, while

there, the Defendant "mentioned she did not know how [the victim] got into the bathtub, that she thought one of the other children had placed her there[.]"

Montgomery County EMS Paramedic David Frost responded to an August 22, 2103 call "for an unresponsive child, ten minutes unresponsive." When he arrived at the victim's home, she "was lying on the floor on her back, her skin was pale, her lips were turning blue and the Fire Department was checking for a pulse in her arm." Mr. Frost, thereafter, assisted in transporting the victim to the hospital. The victim still was not breathing, and the administration of CPR continued. While en route, Mr. Frost was unable to "pass an endotrach[e]al tube into the child's throat" because water was "continuously coming out of her airway." Additionally, Mr. Frost obtained twenty to twenty-two milliliters of water through suctioning of the victim's mouth, which was "quite a bit" for a child that young, in his opinion. Mr. Frost further testified that the victim's skin felt wet; that her diaper was soaked; that the bed the victim was placed on in the ambulance was also wet, the water coming "[f]rom her hair and from the rest of her body"; and that her genital area "appeared to be red and swollen with dark red spots[.]" Once the ambulance arrived at the hospital, care of the victim, who still had fluid in her lungs, was turned over to the hospital staff. The hospital staff was able to get the victim's heart to start beating again, but she never fully recovered.

Clarksville Police Department ("CPD") Officer Joshua Swafford arrived as the victim was being taken to the ambulance. He first made contact at the home with the Defendant, who was crying. According to Ofc. Swafford, the Defendant made the following statement to him at that time:

> She stated to me that she was giving the child a bath and she heard a knock on the door. She came to the door, answered it and then she heard I believe [the victim's father] holler from the bathroom and she had went back there and that's when I guess [someone] called 911.

When asked if the Defendant provided a timeframe "as to how long the child had been left in the tub[,]" Ofc. Swafford replied, "I believe the timeframe she gave me—from the time she left and was at the door talking to whoever it was that knocked on it, was approximately" "five to ten minutes[.]"

After the family's arrival at the hospital, CPD Detective Tim Anderson spoke with the Defendant. The Defendant provided Det. Anderson with the following version of events:

> She explained that she was giving [the victim] a bath and during the procedure of giving her the bath, she had heard a knock at the door and she left the bathroom—left [the victim] in the tub and went to see who was at

-4-

the door and there was a friend at the door and her and the friend had sat down and started having a conversation and the father had come in and went back to the bathroom and started yelling and came out carrying [the victim].

After talking with the Defendant, Det. Anderson, with their permission, visited the family's home, and once there, he photographed the master bathroom. Det. Anderson made the following observations of the bathroom:

> There was water soaked towels or items on the floor, like the carpet that you would normally see in a bathroom that was drenched with water and there was also—you could tell that water had started to come out of the door to the bathroom into the master bedroom, there was like a water mark on the floor;

and just outside the bathroom door, the "floor in the bedroom . . . made that squishy noise when [he] stepped."

The Defendant and the victim's father returned home while Det. Anderson was still there. Det. Anderson asked the Defendant "to kind of walk [him] through the events of what she had previously described" at the hospital:

> [S]he said that she was giving [the victim] a bath and the water was running into the tub and she indicated an area of the tub that to me showed that it was approximately three or four inches of water in the tub at the time, and she heard a knock at the door and she left [the victim] in the tub, left the water running and went out to see who had knocked at the door and I believe that's the point when she identified Ms. Hubbard as being the one that was the visitor that had came over. And she just explained that they had apparently had some differences in the past and they sat down and talked about it to try and work those differences out.

Additionally, CPD Ofc. Scott Beaubien, as a member of the Crime Scene Team, photographed and diagramed the family's home. He confirmed that a person could not see the master bedroom's bathroom if sitting in the living room of the home, and he measured from "the edge of the hallway" in the living room to that bathroom to be approximately thirteen feet in length.

Ofc. Beaubien described two different tests he performed with a water bottle and cell phone timer in the master bathroom's tub—a tub which he described as a "standard bathtub" that was twelve inches deep, twenty and one-quarter inches wide, and forty-eight to fifty-five inches long depending on the measuring points. The first test was done

with the tub spout "full open" using "luke-warm type water[,]" and Ofc. Beaubien determined that it took a total of fourteen minutes and twelve seconds to completely fill the tub to overflowing.  The tub spout was open "halfway" so the tub "would fill up at half speed" in the second test.  According to Ofc. Beaubien, the water level was "relatively high" already at eighteen minutes and thirty-two seconds during this second test, and the photograph shows that the tub was filled to overflowing after twenty-one minutes and twenty-seven seconds.

The parties stipulated that the victim was removed from life support on August 28, 2013, and died on that date.  The parties further agreed that "[t]he report of investigation by [the] County Medical Examiner note[d] that the cause of death [was] drowning and the manner of death listed [was] accident."

The Defendant testified in her defense.  The Defendant claimed that the victim had diarrhea that "went all the way up her back," so she took off the victim's clothes and placed her in the bathtub.  She stated that she had no intention to give the victim a bath but simply intended to clean her up.   The Defendant continued:

> I started the water and after I took her clothes off, . . . I put her in the water. I started filling it up and she likes to play in the water so I let her stay in the water a little while, so I started filling up the water and then I heard a knock on the door.  I did not answer it the first time.  So then the second time, I was worried because nobody answered the door and I knew my husband was outside, but he did not answer the door, so I just went to answer it, not knowing who was at the door.  So when I went, I seen [sic] that it was [Ms. Hubbard], but when—before I went, I thought I turned off the water and went to the door.

The Defendant asserted that she told both her lawyer and her mother that she turned the water off prior to leaving the victim unattended.  Regardless, she stated, "I do blame myself for this every day and I just want you to know that I would never intentionally hurt my daughter."

On cross-examination, the Defendant explained that, while her daughter was able to sit up on her own, she could only sit still for "[a] little [period of time], not a lot."  The Defendant further described the victim as an "[a]ctive little girl" who "moved around" in the bathtub a lot when she was playing.  According to the Defendant, the water was flowing "[s]omewhere in the middle" when she placed the victim in the tub, and there were already "[a] couple of inches" of water in the tub when she went to answer the door. She did not believe that she left the victim alone for more than "about ten minutes."

The Defendant confirmed that the victim could not swim, that she left her seven-month-old child unattended in the bathtub while she sat on the couch talking with Ms. Hubbard and drinking a Strawberrita, and that she did not check on the victim during this time. The Defendant explained that it was not her "plan" to the leave the victim alone but that she "got distracted" when she and Ms. Hubbard began discussing their problems.

At the conclusion of the proof, the jury found the Defendant guilty as charged of aggravated child neglect in count one and guilty of criminally negligent homicide as a lesser-included offense of reckless homicide in count two. The trial court imposed concurrent terms of fifteen years and one year, respectively. The Defendant perfected a timely appeal.

<u>ANALYSIS</u>

The Defendant raises two issues on appeal: (1) whether the evidence was sufficient to support her conviction for aggravated child neglect[1]; and (2) whether the trial court committed reversible error when it instructed the jury during voir dire that counts one and two would merge if guilty verdicts were returned on both counts. We will address each issue in turn.

*I. Sufficiency of the Evidence*

The Defendant first argues that the State failed to show that she engaged in knowing conduct as required to support a conviction for aggravated child neglect. Specifically, the Defendant is contending that "[t]he evidence adduced at trial did not prove that [she] knew she left [the victim] in the bathtub with the water running or with a hazardous level of water in the bathtub." According to the Defendant, the State "did not offer any witness testimony that contradicted [the Defendant's] account of her belief that there was a very small amount of water in the bathtub and that she had turned off the flow of water into the bathtub." The State responds that the Defendant's contention lacks merit, noting that the Defendant's mental state was for the jury to evaluate based on all the circumstances surrounding the offense.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the

_____

[1] She does not challenge the sufficiency of the evidence supporting her criminally negligent homicide conviction.

evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

A person commits child neglect when that person "knowingly abuses or neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare[.]" Tenn. Code Ann. § 39-15-401(b). As charged in the indictment and submitted to the jury in this case, "[a] person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . and: (1) [t]he act of . . . neglect . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). If the victim is under the age of eight years old, aggravated child neglect is a Class A felony. Tenn. Code Ann. § 39-15-402(b). In short, child neglect is composed of three essential elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008).

Further, child neglect is a nature-of-conduct offense, not a result-of-conduct offense. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000). The statute merely requires that the act of neglecting the child must be knowing. Id. By way of illustration, a defendant satisfies the mens rea for child neglect when he or she knowingly leaves a child in a car for more than eight hours, but the mens rea requirement is not satisfied if he or she was unaware the child was present in the car at the time. Id. After the knowing mens rea is established, then the next inquiry is whether the child suffered an adverse effect to the child's health or welfare. Id. If the child has suffered an adverse health effect as a result of defendant's knowing neglect, then the defendant has committed child

neglect, regardless of whether the defendant knew what the result of the neglect would be. Id.

The proof in this case, in the light most favorable to the State, established that the Defendant left her seven-month-old daughter unattended in a bathtub filled with several inches of water when Ms. Hubbard arrived at the home to speak with the Defendant. Ms. Hubbard and the Defendant sat down in the living room to discuss their recent disagreement. The Defendant opened her can of Strawberrita that she had requested Ms. Hubbard bring with her and began drinking it. The Defendant "seemed fine . . . and pretty relaxed," according to Ms. Hubbard. The Defendant's husband also said that the Defendant appeared "normal" that day, with no appearance of being upset or sad about anything.

When the Defendant's husband came inside from mowing the yard "a good ten minutes" into the ladies conversation, he observed the women talking and described them as "just having a conversation like two normal girls would, just chatting away." The Defendant's husband then went to check on the children who were being "rambunctious and playful" in the other room. After telling the children to calm down, he heard "[t]he sound of running bath water" and, thereafter, found the victim "face down floating on the tub, water overflowing" in the master bathroom. According to the Defendant's husband, the water, which he turned off, was about "halfway running[.]" He took the victim, who was not breathing and had no pulse, from the tub and laid her on the floor in the living room and began administering CPR. Water continued to come out of the victim's nose and mouth. When the next door neighbor, Ms. Sinclair, arrived to assist with CPR, she observed that the Defendant "wasn't acting like a [m]om" and "smelled of alcohol." 911 received a call "for an unresponsive child, ten minutes unresponsive."

While en route to the hospital, paramedic Frost was unable to "pass an endotrach[e]al tube into the child's throat" because water was "continuously coming out of her airway." Suctioning was used to obtain twenty to twenty-two milliliters from the child's mouth while in the back of the ambulance, which was "quite a bit" for child as young as the victim, in Mr. Frost's opinion. Mr. Frost also testified that the victim's skin felt wet, that her diaper was soaked, and that the bed she lain on in the ambulance was also wet. Although the hospital staff was able to get the victim's heart beating again, the victim never fully recovered and was removed from life support on August 28, 2013.

Ofc. Swafford arrived on the scene and spoke with the Defendant, and the Defendant told him that she "was giving the child a bath" when she heard a knock on the door and that the child was left alone in the bathtub for "five to ten minutes[.]" Det. Anderson spoke with the Defendant at the hospital, and the Defendant relayed a similar version. However, Ms. Sinclair visited the family later at the hospital, and according to

Ms. Sinclair, the Defendant denied even knowing how the victim got into the bathtub, asserting that "one of the other children had placed [the victim] there[.]"

When Det. Anderson went to the family's home, he saw soaked towels and items on the master bathroom floor, and he determined that water had made it all the way out of the bathroom onto the floor in the master bedroom because the carpet "made that squishy noise when [he] stepped." The Defendant and her husband returned to the home while Det. Anderson was still there. The Defendant admitted to Det. Anderson that there were "approximately three to four inches of water" already in the tub and that she "left the water running" when she went to answer the knock at the front door. Based upon Ofc. Beaubien's tests of the master tub, it took a total of fourteen minutes and twelve seconds to completely fill the tub to overflowing when the tub spout was "full open," and the water level was "relatively high" already at eighteen minutes and thirty-two seconds when the tub was filled up at "half speed."

The Defendant herself admitted to leaving the victim, who "moved around" in bathtub and could only sit up on her own for a brief period of time, alone in "[a] couple of inches" of water when she left to answer the door. She did not believe that she left the victim for more than "about ten minutes[,]" but she acknowledged that she did not check on the victim while she sat conversing and drinking with Ms. Hubbard. Based upon the Defendant's own testimony, the jury could rationally infer that the Defendant acted knowingly when she left her seven-month-old daughter alone in the bathtub and that the act constituted knowing neglect regardless of whether the water was left running. Moreover, it was within the province of the jury to determine the credibility of the proof adduced at trial and to decide whether to accredit the Defendant's claim that she turned the water off before leaving the victim unattended.

A defendant's mental state is a factual question for the jury to resolve. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010) (citations omitted). Additionally, "[o]ur jurisprudence recognizes that the mental state, a necessary factor of almost all our criminal statutes, is most often proven by circumstantial evidence, from which the trier of fact makes inferences from the attendant circumstances and from which that body weighs the circumstantial evidence." State v. Jeffrey Antwon Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. Oct. 13, 2000); see also State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000). Finally, as explained above, the State was not required to prove that the Defendant knew or should have known of the risk of harm posed by her conduct to any degree. See Ducker, 27 S.W.3d at 897. Child neglect is not a result-of-conduct offense, but it is instead a nature-of-conduct offense. Id. We conclude that the evidence was sufficient to sustain the Defendant's conviction for aggravated child neglect. See, e.g., State v. Dewey Burton, Jr., No. E2015-00879-CCA-R3-CD, 2016 WL 3351316, at *9 (Tenn. Crim. App. June 9, 2016) ("Although the

stopper was not in the tub and [d]efendant was not far from the bathroom, it is clear that [d]efendant knowingly left the victim unattended under circumstances that resulted in serious bodily injury."), perm. app. denied (Tenn. Oct. 20, 2016).

## II. Voir Dire Jury Instruction

Next, the Defendant argues that the trial court committed reversible error when it erroneously instructed the prospective jury pool that counts one and two would merge into a single conviction if guilty verdicts were returned on both counts. During voir dire, the trial court gave the following instruction to the venire:

> Your verdict can vary. You can find [the Defendant] not guilty of either of these counts. You can find [the Defendant] guilty of one but not the other. You can find her guilty of both. If you find her not guilty of both counts, then of course, she stands acquitted of the charges, of all charges. If you find her guilty of both counts, then under the law what the [c]ourt would do would be to merge your verdicts into a single conviction because both charges come from the same alleged conduct, so it can only be one conviction, but there are two different allegations for you to consider. I hope I didn't confuse you with that and I will try to go into that a little bit more if I need to later on.

The Defendant submits that she was prejudiced by this instruction, submitting that "[t]he only reasonable interpretation of the 'merger' instruction would be that [the Defendant's] ultimate punishment on the charges together would be lessened because the charges would merge into a single conviction. All things being equal, a single offense . . . will be punished less severely than two offenses." The Defendant further asserts that the "inconsistent verdicts on the two counts (knowing neglect in [c]ount [o]ne and mere criminal negligence in [c]ount [t]wo) suggest that the jury did weigh the charges with a view to the merger instructed by the trial court[,]" and "if no merger instruction had been given, then the jury may have found different, more favorable verdicts, to include possible lesser-included offenses or acquittals, on either of the counts charged." The Defendant concludes, "[T]he jurors may have believed that convicting [the Defendant] of aggravated child neglect was symbolically appropriate, i.e., they felt they had to deliver two guilty verdicts, but, counting on merger of the offenses as instructed by the trial court, did not intend for [the Defendant] to be sentenced on two convictions." In short, the Defendant is essentially arguing that the instruction, which invites the jury to speculate as to which of the charges before it will blend or merge, makes a general statement about Defendant's sentencing exposure and suggests, at least obliquely, that doubts over guilt or innocence on a specific charge may ultimately be of no concern because of merger.

-11-

The State acknowledges that the instruction was given in error but argues that the error was harmless, noting that the "brief error" was at the start of jury selection and that the trial court in its final instructions at trial charged the essential elements of each indicted offense, all appropriate lesser-included offenses, and the separate and distinct nature of each offense. The trial court also determined at the motion for new trial hearing that any error in this regard was harmless. We agree with the State and the trial court as to the harmless nature of the instruction.

In criminal cases, a defendant has a right to a correct and complete charge of the law. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). "An instruction should be considered erroneous only if the jury charge, when read as a whole, fails to submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). Tennessee Code Annotated § 40-35-201(b) provides the following:

> In all contested criminal cases, except for capital crimes that are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Tennessee Constitution, article VI, § 14 and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

In short, this code section states that, in non-capital cases, the trial court may not instruct the jury on the possible penalties for the charged offense or any lesser-included offenses.

A merger of offenses has been generally defined as follows:

> The fusion or absorption of one thing or right into another; generally spoken of a case where one of the subjects is of less dignity or importance than the other. Here the less important ceases to have an independent existence.
>
> . . . .
>
> *Criminal law*. When a man commits a major crime which includes a lesser offense, or commits a felony which includes a tort against a private person, the latter is merged in the former.
>
> . . . .

*Sentences.* If a defendant is charged in two duplicitous indictments with commission of two crimes, he may be sentenced on conviction of the more serious crime but not on both indictments.

Black's Law Dictionary 988-89 (6th ed. 1990).

'Merger' of offenses occurs where two offenses are charged in separate counts but only one conviction is allowed to stand. Merger may occur for a variety of reasons, but is most often a problem where several crimes take place in the course of a single criminal episode. . . . [M]erger may occur where one conviction is a lesser-included offense of another conviction.

David Raybin, Tennessee Criminal Practice and Procedure § 16.20 (footnotes omitted). The concept of merger implicates principles of double jeopardy prohibiting multiple punishments for the same offense. Id. (footnote omitted); see also State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012) (citations omitted). Accordingly, it is clear that merger of offenses implicates sentencing concerns. We must conclude that the interdiction of section 40-35-201(b) applies not only to statements of specific sentence exposure but also to general statements such as the one in this case and, consequently, that the jury instruction given to the venire erroneously provided information on possible punishment options. See State v. David Richardson, No. W2013-01763-CCA-R3-CD, 2014 WL 6491066, at *16 (Tenn. Crim. App. Nov. 20, 2014) (agreeing "that juries must decide cases based on the defendant's guilt or innocence of the charged offense rather than any possible punishment the defendant might face" (emphasis added) (citing State v. Billy Gene Debow, No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *7-8 (Tenn. Crim. App. Aug. 2, 2000))), perm. app. denied (Tenn. Mar. 12, 2015); see also State v. Carswell, 697 A.2d 171, 181 (N.J. Super. Ct. App. Div. 1997) (concluding that merger instruction given during jury deliberations erroneously provided information on possible sentencing options).

This court has reviewed fact patterns dealing with erroneous jury instructions on specific sentence exposure on several prior occasions and found that the statements, although made in error, were harmless. Compare State v. Ramone Lawson, No. W2013-00324-CCA-R3-CD, 2014 WL 1153268, at *4-6 (Tenn. Crim. App. Mar. 19, 2014) (holding that a trial court's instructions "to the prospective jurors and the later instruction to the jury [at trial] about the penalties for first degree murder" were harmless error); State v. Derek Willamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *4-6 (Tenn. Crim. App. Aug. 12, 2011) (determining that a trial court's remarks to the jury venire that the State was not seeking the death penalty or life imprisonment without the possibility of parole, therefore, should the jury find the defendant guilty of first-degree murder, an automatic life sentence would be imposed was harmless error); State v.

Charles Ray Allen, No. M1999-00818-CCA-R3-CD, 2000 WL 1649507, at *7-8 (Tenn. Crim. App. Nov. 3, 2000) (concluding that a trial court's telling potential jurors during voir dire and again during jury instructions that the State was not seeking life without the possibility of parole and that a guilty verdict would result in the defendant's receiving a life sentence was harmless error); State v. Edward Pinchon, No. M1999-00994-CCA-R3-CD, 2000 WL 284071, at *4 (Tenn. Crim. App. Mar. 17, 2000) (concluding that a trial court's instructing the jury that the State was not seeking life without the possibility of parole and that a guilty verdict would result in the defendant's receiving a life sentence was harmless error); with Richardson, 2014 WL 6491066, at *16 (holding that a trial court's comments to the venire informing them that the State was not seeking the death penalty or a sentence of life imprisonment without parole, but not mentioning that the defendant would receive an automatic life sentence if convicted, were not made in error).

In Pinchon, the trial judge instructed the jury that, if the defendant was convicted of first degree murder, he would receive a sentence of life imprisonment with the possibility of parole. 2000 WL 284071, at *1. This court held that, when the trial court so errs, "the defendant must demonstrate that, but for the erroneous instruction, there is a reasonable probability the jury would have acquitted him of first degree murder and found him guilty of the lesser offense[.]" Id. at *4. In Allen, the trial court instructed the jury pool at voir dire that the State was not seeking the death penalty or life imprisonment without parole, therefore, should the jury find the defendant guilty of first degree murder the "automatic sentence . . . would be an automatic life sentence." 2000 WL 1649507, at *7. The trial court also repeated this in the jury charge. Id. at *7. In that case, this court held that the "trial court's error in instructing the jury about the penalties for first degree murder does not 'affirmatively appear to have affected the result of the trial on the merits.'" Id. at *8.

We believe that the case before us warrants a similar conclusion. Except for the trial court's misstatement regarding merger made during voir dire, the trial court made no further comments about the Defendant's potential sentencing exposure. At trial, in its final charge to the jury, the trial court instructed the jury on the essential elements of the charged offenses, on all appropriate lesser-included offenses, and on order of consideration principles. The trial court further instructed the jury in its closing instructions at trial that they were to consider each count independently:

> The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and the law applicable to it. The defendant may be found guilty or not guilty of any or all of the offenses charged. Your finding as to each crime charged must be stated in your verdict.

<u>See</u> T.P.I.—Crim. § 41.03.  Moreover, the fact that the jury convicted the Defendant of the lesser-included offense of criminally negligent homicide in count two shows their reasoned and considerate verdicts.  The record contains no proof that the jury would have convicted the Defendant of any of the additional lesser-included offenses, or acquitted her, had the challenged information not been provided.  Due to the overwhelming evidence of the Defendant's guilt as outlined in the section above, we conclude that the trial court's error in instructing the jury regarding merger of the Defendant's convictions does not affirmatively appear to have affected the result of the trial on the merits, and she is not entitled to a new trial on this ground.

CONCLUSION

In sum, we conclude that the evidence was sufficient to support the Defendant's conviction for aggravated child neglect and that the jury instruction error during voir dire was harmless.  Accordingly, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE